**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON DRIVE LIONVILLE, LP, et al., | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 2:15-cv-3435 |
| | : | |
| PARKE BANCORP, INC., et al., | : | |
| | : | |
| Defendants. | : | |

**Goldberg, J.**                                                  **December 29, 2016**

**<u>MEMORANDUM OPINION</u>**

Plaintiffs, six limited partnerships and two individuals involved in those partnerships, have sued a bank and two of its employees alleging violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C §§ 1961, et seq. in connection with a series of substantial commercial loans and subsequent transactions. Plaintiffs assert that these Defendants used falsified collateral documentation and the money available under the lines of credit extended to the partnerships as a single "piggy bank." According to Plaintiffs, Defendants undertook this activity to create the appearance that the various loans extended to Plaintiffs were performing in order to protect the bank's assets, mislead regulators about the health of the bank's loan portfolio and fund other separate investment endeavors.

In addition to three RICO claims, Plaintiffs also assert state law claims for fraud, conversion and civil conspiracy. Before me is Defendants' motion to dismiss, which, for the reasons that follow, I will grant in part and deny in part.

I.      **FACTS ALLEGED IN THE COMPLAINT**

The following facts are taken from the Complaint and viewed in the light most favorable to Plaintiffs:

In 2003, non-party Bruce Earle and Plaintiff George Spaeder entered into an "oral partnership agreement" for the purpose of buying, selling and developing various real estate projects. To carry out this business agreement, Earle and Spaeder formed multiple limited partnerships ("the Partnerships") in order to purchase a single commercial property. Six of these Partnerships are Plaintiffs in the instant case: Devon Drive Lionville, L.P. ("Lionville"), North Charlotte Road Pottstown, L.P. ("Pottstown"), Main Street Peckville, L.P. ("Peckville"), Rhoads Avenue Newtown Square, L.P. ("Rhoads"), VG West Chester Pike, L.P. ("West Chester"), and 1301 Phoenix, L.P. ("Phoenix"). (Compl. ¶¶ 3-8, 18-19.) Spaeder and another individual, John M. Shea, are also named as plaintiffs.

Spaeder was principally in charge of managing the day-to-day business of Lionville, Pottstown and Peckville and served as the Manager of the general partner entities for each. Earle's involvement with Lionville, Pottstown and Peckville was as an independent contractor acting through his wholly-owned company, Rosedon Holding Company L.P. ("Rosedon"). Rosedon "took custody" of the books and was responsible for monitoring the finances of Lionville, Pottstown and Peckville. (Compl. ¶ 20.)

Lionville, Pottstown, and Peckville each obtained financing through Parke Bank in order to purchase and develop the commercial properties held by each Partnership.[1] Defendant Vito S. Pantilione, an officer and director of Parke Bank, facilitated these loan transactions. (Compl. ¶¶ 21-23.)

---

[1] Parke Bank is a wholly owned-subsidiary of Defendant Bancorp, Inc. (Compl. ¶ 12.) For simplicity, I refer to these two entities collectively as "Parke Bank."

2

In December of 2007, Lionville borrowed $3,098,000 from Parke Bank. In March of 2008, Pottstown borrowed $8,000,000 from Parke Bank. In May of 2008, Peckville borrowed $5,200,000 from Parke Bank. In connection with each of these transactions, Parke Bank was provided with copies of the relevant partnership agreements as well as the operating agreement of each partnership's general partner entity. (Compl. ¶¶ 26-28.)

In the summer of 2008, Earle approached Pantilione about obtaining a line of credit from Parke Bank in order to finance other real estate ventures. Pantilione identified a property located in Margate, New Jersey ("Margate Property") owned by Earle and his wife as a source of security to back the line of credit. Pantilione explained to Earle that Earle could not personally guarantee the line of credit because of Federal Deposit Insurance Corporation ("FDIC") lending limit regulations.[2] Pantilione suggested that Earle approach Plaintiff John M. Shea about guaranteeing the line of credit, explaining, although Shea would personally guaranty repayment of the line of credit, Parke Bank would view the Margate Property as the "real" security. (Compl. ¶¶ 29-33.)

 Parke Bank, at Pantilione's direction, hired a long-time friend of Pantilione's to appraise the Margate Property. Although historically valued at $5 million, Pantilione's contact valued the Margate Property at $12 million. (Compl. ¶ 31.)

Following Pantilione's assurance that Parke Bank viewed the Margate Property to be the actual security for the line of credit, Shea agreed to personally guaranty the $5 million line of credit extended to Earle. At settlement, Parke Bank represented that $2.35 million would be used to improve the collateralization of the Lionville, Pottstown and Peckville loans. Despite this representation, Parke Bank never transferred any of those funds. (Compl. ¶¶ 32-33.)

---

[2] Plaintiffs do not explain in any detail which FDIC lending limits are at issue. The Complaint references federal "'loan to one borrower' lending limit regulations.'" (Compl. ¶ 23.)

In 2011, Earle and Spaeder's relationship deteriorated and many of their business ventures began to collapse. Parke Bank's loans to Peckville and Pottstown went into default. (Compl. ¶ 34.)

In 2012 Parke Bank confessed judgment against Pottstown in excess of $9.7 million dollars and against Peckville in excess of $5.6 million. Rosedon and Earle also defaulted on loans made by Parke Bank, which were pursued by Parke Bank through confessed judgments as well. (Compl. ¶ 36.)

As detailed more fully below, the Complaint alleges that Parke Bank, Pantilione, Defendant Ralph Gallo, the Senior Vice President and "Chief Workout Officer" at Parke Bank and Earle, engaged in a series of "varied, but equally unlawful actions taken in furtherance of the individual and/or collective interests of Parke Bank, Pantilione, Gallo and Earle." (Compl. ¶¶ 14, 39.) Plaintiffs refer to the association between the Defendants and Earle as the "BPGE enterprise." (Id.)[3]

According to Plaintiffs, the BPGE enterprise engaged in this conduct in order to create the appearance of performing loans, to protect Parke Bank's financial health, evade scrutiny by regulators, increase the amount of funds that could be categorized as 'income' rather than a return of principle and fund additional investment ventures. Plaintiffs posit that the BPGE enterprise's wrongdoing was motivated in part by the fact that Parke Bank came under "increasing pressure to trim back problem loans, ultimately culminating with its entry into a Consent Order with the FDIC in April 2012." (Compl. ¶¶ 40, 50, 51.)

---

[3] Plaintiffs allege that they first uncovered evidence of the BPGE enterprise during the course of bankruptcy proceedings Spaeder instituted on behalf of Peckville in July of 2013. (Compl. ¶ 39.)

The Complaint summarizes Defendants' "engagement in a wide variety of RICO predicate acts involving mail, wire, and bank fraud, by and through:"

(a) Unauthorized transfers of funds between Parke Bank accounts for the Partnerships;

(b) Unauthorized transfers of funds from Parke Bank accounts for the Partnerships to other bank accounts outside of Parke Bank;

(c) Misdirecting construction draws and payments;

(d) Unauthorized transfer of line of credit funds;

(e) Unilaterally amending the repayment terms of loans;

(f) Instituting unfounded and fraudulent "late charges;" and

(g) Inducing, and later taking legal action on, security instruments obtained under false presences [sic] from at least one of the Partnerships.

(Compl. ¶ 2.) The specific allegations supporting these supposed predicate acts are as follows:

– Parke Bank, Pantilione, Gallo and Earle treated Lionville, Pottstown and Peckville as a collective source of funds despite the fact that they were separate entities with discrete assets and ownership structures. The partnership and operating agreements governing Lionville, Peckville, and Pottstown vested exclusive management control over all decisions in Spaeder. The agreements expressly prohibited Earle from any right to manage, control, act for or obligate Lionville, Peckville and Pottstown. (Compl. ¶¶ 52-54.) However, without consent from the relevant Partnerships, Parke Bank unilaterally made multiple transfers of funds from the Lionville, Peckville and Pottstown accounts to other Parke Bank accounts as well as outside bank accounts held by Rosedon. Between 2008 and 2013, Parke Bank made approximately fifteen unauthorized transfers from Lionville's account totaling approximately $1.6 million, at least eight unauthorized transfers from Pottstown's account totaling approximately $1.2 million and an unspecified number of unauthorized transfers from Peckville's accounts in excess of $1.3 million dollars. (Compl. ¶¶ 62-63, 74-75, 92-93.)

– Contrary to the terms of a construction loan agreement with Pottstown and without Pottstown's authorization, Parke Bank released funds earmarked for construction draws to Rosedon. Earle then directed a portion of the misdirected funds to the pertinent construction company as payment and kept the rest for himself. Parke Bank also misdirected approximately $3.8 million

5

of Pottstown's $4.1 million in construction draw funds to Rosedon and/or Earle. (Compl. ¶¶ 73, 76-79.)

– Parke Bank unilaterally extended the maturity date of Peckville's loan without Peckville's consent. Additionally, Parke Bank, Pantilione and Gallo facilitated the transfer of funds to Rosedon by honoring forged or unsigned checks payable against Lionville's, Peckville's and Pottstown's accounts with Parke Bank. (Compl. ¶¶ 64, 80, 95-98.)

The Complaint explains that the foregoing transactions were intended to provide Earle with additional funds that were not directly tied to him or to Rosedon. In doing so, Defendants attempted to circumvent FDIC lending limit regulations, enable Earle/Rosedon to make payments on existing obligations to Parke Bank and create the appearance that these defaulting loans were performing. (See, e.g., Compl. ¶¶ 63, 94.)

Plaintiffs allege that, in order to conceal the foregoing conduct of the BPGE enterprise, Earle prevented Spaeder from having access to the Partnership books and encouraged Spaeder to focus on managing Lionville, Pottstown and Peckville while Earle handled the finances. Earle, with the knowledge of Pantilione and Gallo, also ensured that correspondence from Parke Bank to Lionville, Pottstown and Peckville was sent directly to Rosedon's offices. As a result, Spaeder, Lionville, Pottstown and Peckville were unaware of the transfers orchestrated by the BPGE enterprise. (Compl. ¶¶ 55-57.)

As a result of these acts, Plaintiffs assert that the BPGE enterprise's conduct caused Lionville, Pottstown and Peckville to loose rental income associated with development projects, tenants to cancel leases, and the partnerships to ultimately default on their repayment obligations to Parke Bank. (Compl. ¶¶ 65, 69-70, 81-86, 101-102.)

The other three partnerships, Rhoads, West Chester and Phoenix, were also allegedly impacted by the BPGE enterprise's conduct. As part of an investigation into Parke Bank's business practices, the FDIC scrutinized the construction loan to Pottstown. As a result of Parke

Bank's assignment of the wrong appraisal to the Pottstown property and Parke Bank and Earle's "plundering" of Pottstown's liquid assets, the construction loan was under-collateralized. (Compl. ¶¶ 103-117.)

Facing increasing pressure from the FDIC, Plaintiffs claim that Pantilione advised Spaeder that Pottstown must present additional collateral or Parke Bank would declare the loan in default. Pantilione assured Spaeder that he would not record any additional collateral provided by Pottstown but that he only intended to present evidence of the additional collateral to appease the FDIC. (Compl. ¶¶ 27, 104-105.)

To comply with Pantilione's directive, Rhoads allegedly executed a leasehold mortgage and security agreement in favor of Parke Bank for each of the parcels of land it held and also executed an assignment of rents it collected from Rite-Aid, a tenant occupying one of the parcels ("Rite-Aid Documents"). Approximately nine months after their execution, Pantilione recorded the Rite-Aid Documents. Thereafter, Parke Bank attempted to secure a judgment by confession against Rhoads. As a result, Rhoads suffered "the loss of use of the undeveloped parcel," and other tenants demanded new, less favorable lease terms upon learning of the recorded Rite-Aid Documents. (Compl. ¶¶ 106-109.)

The Complaint further alleges that, in order to fund the defense of Pottstown and Peckville in lawsuits brought by Parke Bank, West Chester and Phoenix were "forced" to sell their respective properties at a loss. Spaeder was likewise compelled to expend significant sums of his own money to maintain the viability of the Partnerships when they became "cash-starved" as a result of the BPGE enterprise's conduct. (Compl. ¶¶ 110-115.)

Plaintiffs press the following claims: (1) conduct and participation in an enterprise through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c);

(2) acquisition and maintenance of an interest in and control of an enterprise engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(b); (3) conspiracy to engage in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(d); (4) fraud; (5) conversion; and (6) civil conspiracy. Defendants have moved to dismiss all six claims.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id.

To determine the sufficiency of a complaint under Twombly and Iqbal, the Court must take the following three steps: (1) the Court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

Rule 9(b) provides that: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The United States Court of Appeals for the Third Circuit has explained that Rule 9(b) "requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to

safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). To meet this standard, a plaintiff must plead the "date, place or time" of the alleged fraud or may "use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Id.

### III.   DISCUSSION

#### a.   Preclusive Effect of Prior Litigation on All Claims

Pointing to various judgments, decisions, pleadings, dockets, settlements and releases from the many other court proceedings between the numerous parties involved in this case, Defendants move to dismiss the Complaint because at least one of the Plaintiffs has litigated "nearly every one of the claims that they make in this case." (Defs.' Mot. p. 2.) As such, Defendants argue that the doctrines of res judicata and collateral estoppel preclude Plaintiffs' claims. To this end, Defendants request that I take judicial notice of thirty-six documents from ten other court cases which Defendants urge justify dismissal of the Complaint.

Plaintiffs respond that it would be improper to consider the documents cherry-picked by Defendants without a more complete and accurate record of the prior court proceedings. Additionally, Plaintiffs urge that the documents and Defendants' reliance on these documents raise numerous factual issues which need to be resolved before it can be determined what preclusive effect, if any, the prior litigation has on this case.[4]

---

[4]  Plaintiffs also object to Defendants' motion for judicial notice on the ground that the documents on which Defendants rely "consist mostly of dockets, filings and court orders that are the direct result of action or inaction by Defendants' co-conspirator, Earle, [who] had exclusive control over the Partnerships from December 2011 to October 2013." As such, Plaintiffs argue that "anything that occurred during this time period was in furtherance of the Defendants' racketeering enterprise. For this reason alone, this Court should decline to glean any factual or legal conclusions from Defendants' documents." (Pls.' Resp. to Mot. for Judicial Not. p. 4.)

In relevant part, Federal Rule of Evidence 201(b)(2) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c). "While the rules allow a court to take judicial notice at any stage of the proceedings, Fed. R. Evid. 201(f)", the Third Circuit has stated "that it should be done sparingly at the pleadings stage. Only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point." Victaulic Co. v. Tieman, 499 F.3d 227, 236 (3d Cir. 2007).

When confronted with similar arguments in a RICO case, the Honorable Harvey Bartle III of this Court declined to resolve the preclusive effect of prior litigation and a "binding release" at the motion to dismiss stage. Kaiser v. Stewart, 1997 WL 476455 n.28 (E.D. Pa. Aug. 19, 1997). Judge Bartle agreed with the plaintiff "that these fact-based defenses are not proper to consider on a motion to dismiss. An affirmative defense may only be argued on a motion to dismiss if the affirmative defense clearly appears on the face of the pleading." Id. at *21.

I agree with Judge Bartle's reasoning because it is consistent with the standards of review applicable at the motion to dismiss stage and the limitations on the Court's ability to take judicial notice. Defendants' request that I review the pleadings, dockets, orders, complaints and judgments that they have selectively culled from ten separate cases and make a determination as to the preclusive effect that the prior litigation has on a particular Plaintiffs' ability to litigate particular portions of the RICO claims they have brought in the present case. Under Rule 201(c),

---

This argument raises additional factual issues which are not appropriately resolved at this nascent stage of the litigation.

I decline to take judicial notice of these documents because, at this stage of the case, I do not have the "necessary information" from the prior litigation.

### b.  <u>Count I – Civil RICO – 18 U.S.C. § 1962(c)</u>

In count one, all Plaintiffs bring a claim against all Defendants pursuant to 18 U.S.C. § 1962(c) which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). A violation of this section requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223 (3d Cir. 2004) (citing <u>Sedima v. Imrex Co.</u>, 473 U.S. 479, 496 (1985)).[5]

In order to state a claim under this subsection, a plaintiff must plead: "(1) the existence of an enterprise engaged in or affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts." <u>Munsif v. Cassel</u>, 331 F. Appx. 954, 958 (3d Cir. 2009).

In reviewing Plaintiffs' Complaint, I remain mindful that the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes." <u>Boyle v. United States</u>, 556 U.S. 938, 944 (2009) (citing § 904(a) of Pub.L. 91–452, 84 Stat. 947, see note following 18 U.S.C. § 1961).

---

[5] The caption to Count I states that the § 1962(c) claim is brought by "all Plaintiffs." (Compl p. 29.) However, the allegations that follow refer to the Partnerships alone. For example, when setting forth the allegations regarding the injury caused by Defendants the Complaint states "each of the plaintiff Partnerships suffered substantial injury. . ." (<u>See, e.g.</u>, Compl. ¶¶ 126-127.) If Plaintiffs choose to file an amended complaint, they should clarify whether Spaeder and Shea are also bringing a § 1962(c) claim.

i. *Allegations Regarding the Existence of an Enterprise*

Defendants argue that Plaintiffs' § 1962(c) claim must be dismissed because the Complaint fails to adequately allege the existence of an enterprise. Defendants urge that the allegations do not adequately establish a plausible shared purpose, a structure within the enterprise for directing its activity, or an existence separate and apart from the pattern of racketeering activity in which the enterprise's members were allegedly engaged.

The RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has established an expansive understanding of this requirement, observing that "[t]he [RICO] statute does not specifically define the outer boundaries of the 'enterprise' concept," and that "this enumeration of included enterprises is obviously broad, encompassing 'any . . . group of individuals associated in fact.'" Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 1961(4)) (emphasis in Boyle); see also In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 366 (3d Cir. 2010) ("the Boyle Court highlighted several elements of the RICO statute that pointed toward a capacious construction of the term.")

While the "enterprise" element remains distinct from the "racketeering activity" element, "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" In re Ins. Brokerage Antitrust Litig., 618 F.3d at 368 (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)). In this regard, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer existence of an association-in-fact enterprise." Id.

Here, Plaintiffs allege the existence of an association-in-fact enterprise. This type of enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to pursue the enterprise's purpose." Id. at 366 (quoting Boyle, 556 U.S. at 946).

In support of their motion, Defendants first assert that the purpose of the BPGE enterprise's alleged scheme – where Parke Bank rendered the Partnerships that owed it over $14 million dollars unable to repay – is implausible. Defendants note that the Complaint alleges that Earle drained the Partnerships of their funds for his own use and Defendants, while on the other hand, participated in this scheme to avoid FDIC scrutiny of their loan portfolio. According to Defendants, these are "cross purposes" because Earle's alleged theft from the Partnerships would necessarily render the Partnership's loans non-performing and subject to increased scrutiny from regulators. As such, Defendants urge that the alleged shared purpose is implausible and the claim fails under Iqbal.

Plaintiffs respond that the purpose element of Boyle is not synonymous with the motivation behind each RICO defendant's actions. As such, Plaintiffs argue that Earle's motivation for taking part in the BPGE enterprise need not be the same as that of Parke Bank. Rather, Plaintiffs contend that they have satisfied Boyle because the Complaint alleges that each Defendant facilitated the BPGE enterprise's common purpose of misappropriating funds from the Partnerships.

Additionally, Defendants urge that the BPGE enterprise as alleged is nothing more than the sum of the alleged pattern of racketeering activity and that, in this case, those allegations are an insufficient basis in which to infer the existence of an association-in-fact enterprise. Plaintiffs

respond that a section 1962(c) enterprise need not have a particular structure for making decisions and/or controlling and directing its activity.

At this stage, I conclude that the Complaint sufficiently spells out the "structural features" of an association-in-fact enterprise. Plaintiffs have alleged a plausible shared purpose – defrauding the Partnerships and using the ill-gotten assets to further Defendants' own financial interests. Although the members of the BPGE enterprise may have intended to use the ill-gotten funds to further their independent but inarguably related and mutually beneficial interests, the Complaint plausibly alleges that Defendants engaged in a common course of conduct for the purpose of misappropriating funds from the partnerships.

The Complaint also alleges that the objectionable conduct occurred from 2008 through 2012. This four year span satisfies the longevity requirement in Boyle as it is sufficient to allow Defendants to pursue the enterprise's purpose. See United States v. Eiland, 738 F.3d 338, 360 (D.C. Cir. 2013) (two years sufficient); Laudien v. Caudill, 92 F. Supp. 3d 614, 619 (E.D. Ky. 2015) (three years sufficient); Automated Teller Mach. Advantage LC v. Moore, 2009 WL 2431513, at *7 (S.D.N.Y. 2009) (approximately two years sufficient).

I recognize that Plaintiffs do not allege a formal structure which is wholly distinct from the racketeering activity. However, post-Boyle, an association-in-fact enterprise need not have an ascertainable structure. In fact, "the evidence establishing the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" Ins. Brokerage Antitrust Litig., 618 F.3d at 368.

Plaintiffs allege that the enterprise consisted of an association of the following individuals: Parke Bancorp, Inc., Parke Bank, Pantilione, Gallo and Earle. With the exception of Gallo, (see footnote 6), the Complaint also sufficiently alleges how each individual was involved

in the alleged pattern of racketeering activity and how the BPGE enterprise functioned as a continuing unit.[6]

As explained in further detail below, the Complaint also sufficiently alleges a pattern of racketeering activity. These allegations coupled with the aforementioned allegations regarding purpose and longevity are sufficient to sustain Plaintiffs' burden to plead the existence of the association-in-fact enterprise. Boyle, 556 U.S. at 942 n.1 ("Common sense suggests that the existence of an association-in-fact enterprise is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure").

> ii. *Whether Defendants are Distinct Individuals Associated with the Enterprise*

Defendants also argue that Plaintiffs' § 1962(c) claim fails because they have not alleged a distinct individual that is associated or employed by the enterprise. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001) (to state a claim under § 1962(c), a plaintiff must allege "the existence of two distinct entities: (1) a 'person' [who operates or manages the enterprise]; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.")

_____

[6] The Complaint does not adequately set forth what specific role Gallo played in the alleged wrongful conduct. A careful review of the Complaint reveals that the overwhelming majority of allegations against Gallo are conclusory and, therefore, not entitled to the presumption of truth. See, e.g., (Compl. ¶ 58 ("by and through the unlawful actions of Parke Bank, Pantilione, Gallo and Earle in furtherance of the BPGE Enterprise, the Lionville, Pottstown and Peckville partnerships were plundered. . .")) Many of the few remaining allegations pertaining to Gallo are qualified by the statement "based on information and belief."

While the requirements of Federal Rule of Evidence 9(b) are relaxed when factual information is peculiarly within the defendant's knowledge and control, as is arguably the situation here, "boilerplate and conclusory allegations will not suffice." In re Rockefeller Center Properties, Inc., 311 F.3d 198, 216 (3d Cir. 2002). "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." Id. If Plaintiffs choose to file an amended complaint and press claims against Gallo, they should endeavor to provide additional factual assertions regarding Gallo's involvement in the alleged wrongdoing.

Specifically, Defendants posit that Parke Bank, Gallo and Pantilione are one individual because a corporation acts through its employees and agents. Therefore, according to Defendants, the enterprise allegedly consists of essentially two individuals – Parke Bank and Earle. Citing a settlement agreement reached in a separate case whereby Spaeder purportedly agreed to release all claims against Earle,[7] Defendants assert that "without Earle," the enterprise that Plaintiffs have alleged consists entirely of Parke Bank and Parke Bank cannot comprise both the person and enterprise for purposes of a § 1962(c) claim.

In support of this proposition, Defendants cite to Brittingham v. Mobil Corporation, 943 F.2d 297, 301 (3d Cir. 1991) where the Third Circuit stated:

> We believe a § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation. A corporation must always act through its employees and agents, and any corporate act will be accomplished through an "association" of these individuals or entities. . . . [W]e must examine the enterprise allegation to determine whether it is no more than an association of individuals or entities acting on behalf of a defendant corporation. Our decision is in accord with numerous courts that have rejected attempts to circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or entities affiliated with a defendant corporation.

Brittingham v. Mobil Corp., 943 F.2d 297, 301 (3d Cir. 1991). The Third Circuit reasoned that "[w]ithout allegations or evidence that the defendant corporation had a role in the racketeering

---

[7] A large portion of Defendants' preclusion arguments focus on a settlement agreement that resolved a lawsuit Spaeder filed against Earle, Earle's wife and Rosedon in the Court of Common Pleas of Delaware County. Defendants cite to this settlement agreement in multiple sections of their motion to dismiss. Given the centrality of this document to Defendants' motion, I address it separately briefly below.

Defendants urge that pursuant to the settlement agreement Spaeder released all claims, "known or unknown," against Earle, Rosedon and their "affiliates" and "agents" from "the beginning of time" until September 30, 2013. (Defs.' Mot. to Dismiss p. 23.) Based on this settlement, Defendants seem to argue that, in light of the settlement agreement, Earle may not properly be included as a member of the BPGE enterprise.

A determination regarding the effect of the release is inappropriate at the motion to dismiss stage. As such, at this juncture, I will consider allegations regarding Earle's involvement in the BPGE enterprise.

activity that was distinct from the undertakings of those acting on its behalf, the distinctiveness requirement is not satisfied." Id. at 302.

Plaintiffs point out that the portion of Brittingham on which Defendants rely was overruled by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258, 260 (3d Cir. 1995). In Jaguar, the Third Circuit further explained that in an § 1962(c) action against officers conducting a pattern of racketeering activity through a corporate enterprise, "the plaintiff can only recover against the defendant officers and cannot recover against the corporation simply by pleading the officers as the persons controlling the corporate enterprise, since the corporate enterprise is not liable under § 1962(c) in this context." Id. Rather "a corporation would be liable under § 1962(c), only if it engages in racketeering activity as a 'person' in another distinct 'enterprise,' since only 'persons' are liable for violating § 1962(c)." Id.

The parties' foray into the parameters of the distinctness requirement post-Jaguar is somewhat academic because Plaintiffs have not alleged that the enterprise consists of Parke Bank and its employees. Rather, a fair reading of the Complaint reveals that the alleged enterprise is an amalgam of a corporation (Parke Bank), two of its employees (Pantilione and Gallo) and a third-party non-employee (Earle).

Courts in this circuit have found that similarly composed enterprises satisfy section 1962(c)'s distinctiveness requirement. For example, in Mega Concrete, Inc. v. Smith, 2013 WL 3716515, (E.D. Pa. July 15, 2013), the enterprise was alleged to consist of a corporation, its president and an accounting clerk employed by a separate entity. The court denied a motion to dismiss the plaintiff's § 1962(c)'s claims brought against the corporation and its president on distinctiveness grounds. The court reasoned that the enterprise "involves a third-party member who does not come within the other members' corporate sphere. Inclusion of [the third party]

tends to negate the notion that the enterprise is [the corporation] or [its employee], simply called by another name, and presents at least reason to doubt that distinctiveness concerns defeat [the plaintiff's] RICO claim against them." Id. at *13.

Levine v. First American Title Insurance Co., 682 F. Supp. 2d 442 (E.D. Pa. 2010) is also instructive. There, the enterprise was alleged to consist of a title insurance company and outside agents it hired to perform title searches and other settlement services. Id. at 460. In denying a motion to dismiss the §1962(c) claim brought against the title insurance company, the court emphasized that the title agents were not employees of the title insurance company but rather "nonexclusive agents who work with different title insurance companies," and as such, the agents were "separate, independent entities who do not function as subsidiaries or employees of" the title insurance company. Id. at 459. In light of these allegations, the court concluded that the plaintiffs had "satisfied the minimum 'person' and 'enterprise' distinctiveness requirement because the combination of [the title insurance corporation] and the title agents constitute a single 'enterprise' separate and distinct from the 'person' of [the title insurance company], and this combination is permissible under RICO jurisprudence." Id. at 460.

Similar to the enterprises alleged in Mega Concrete and Levine, here, the BPGE enterprise is alleged to consist of a corporation and its employees as well as a third-party outside of the corporate structure. At this stage, Plaintiffs have plausibly pled that the enterprise is distinct from the individuals who allegedly operated and managed the enterprise.

### iii.   Predicate Acts of Racketeering Activity

Plaintiffs allege bank fraud, wire fraud and mail fraud as the RICO predicate acts. Defendants respond that Plaintiffs have failed to plead a pattern of racketeering activity or, in the case of bank fraud, any racketeering activity at all.

18

"Racketeering activity," as defined by the RICO statute, is not so much a definition as a list of offenses which can serve as a predicate offense for establishing a RICO claim. Included in this list is "any act which is indictable under [] the following provisions of title 18 United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud)." 18 U.S.C. § 1961(1). Further, a "'pattern of racketeering activity' requires at least two acts of racketeering activity . . . the last of which occurred within ten years [] after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

### 1. Bank Fraud

The bank fraud statute, 18 U.S.C. § 1344, prohibits knowingly executing or attempting to execute, a scheme or artifice:

(1) to defraud a financial institution; or

(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

The elements of bank fraud are "the defendant knowingly (1) engaged in a scheme to defraud a federally insured financial institution, or (2) participated in a scheme to obtain money under custody or control of the financial institution by means of false statements or representations." United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987). Section 1344(1) of the bank fraud statute "includes the requirement that a defendant intend to 'defraud a financial institution'; indeed, that is § 1344(1)'s whole sum and substance." Loughrin v. United States, 134 S. Ct. 2384, 2389-90 (2014).

According to Defendants, the Complaint is deficient because it does not allege that Defendants defrauded or intended to defraud a financial institution, a necessary element under

section 1344(1).[8] On this point, I agree with Defendants. The Complaint alleges only that the BPGE enterprise defrauded Plaintiffs, who are individuals and limited partnerships. The Complaint does not allege that Defendants intended to defraud Parke Bank. The Complaint states, without differentiation, that Parke Bank, as a defendant, is a party who committed the fraudulent acts. These allegations do not satisfy the requirements of § 1344(1). Put another way, Section 1344(1) does not contemplate a financial institution defrauding itself. Additionally, there is no basis to infer that the Defendants, including Parke Bank, intended to defraud some other unspecified financial institution.

### 2.  Mail Fraud

The elements of mail fraud are: "(1) a scheme to defraud; (2) use of the mails to further that scheme; and (3) fraudulent intent." United States v. Pharis, 298 F.3d 228, 233-34 (3d Cir. 2002).[9]

Defendants argue that Plaintiffs' predicate acts of mail fraud also fail because the Complaint does not allege a plausible scheme to defraud.[10] This argument fails for the reasons previously discussed in the context of the plausibility of the enterprise's shared purpose.

Additionally, Defendants assert that Plaintiffs have failed to plead the predicate acts of mail fraud with the specificity required by Federal Rule of Civil Procedure 9(b). Defendants

---

[8] While allegations contained in the Complaint suggest that Defendants' conduct was motivated in part by a desire to mislead or defraud the FDIC, that entity does not constitute a "financial institution." See 18 U.S.C. § 20 (defining financial institution as ten types of entities none of which encompass the FDIC itself).

[9] "The scheme need not involve affirmative misrepresentation . . . but the statutory term 'defraud' usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching.'" Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir. 1991) (quoting McNally v. United States, 483 U.S. 350, 358 (1987)) (internal citations omitted).

[10] Defendants renew their argument that it is not plausible that Parke Bank would seek to render the Partnerships that owed it over $14 million dollars insolvent.

contend that Plaintiffs have failed to allege any "specifics like date, sender, recipient and content" or offer an explanation as to how any particular mailing was misleading or how it contributed to the alleged fraudulent scheme. (Defs. Mot. pp. 37-38.)

Plaintiffs respond that the Complaint provides adequate information to place Defendants on notice of the transactions alleged to be fraudulent and "to permit Defendants to defeat [the Complaint] would distort the purpose" of Rule 9(b) because Defendants have control and access to all of the relevant transactional records. (Pls.' Resp. pp. 33-34.)

In their response in opposition to the motion to dismiss, Plaintiffs submitted five charts which list "examples of some of the predicate acts in greater detail." (Pls.' Resp. p. 34 n.11.) These charts, which were not referenced in the Complaint, list the dates, amount, and relevant accounts involved in the allegedly fraudulent transfers. (Pls.' Resp., Exs. 18-23.)

After careful review of the Complaint, I conclude that it does not allege the predicate acts of mail fraud with the requisite degree of particularity. Where acts of mail and wire fraud constitute the alleged predicate RICO racketeering acts, those acts are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002). While the Complaint sets out the overall fraudulent scheme with great detail, it lacks sufficient detail as to the date, place or time of the alleged fraud or how Defendants used the mails in furtherance of the scheme.[11] Nor does the Complaint employ other measures which provide Defendants with fair notice of the allegations underlying the mail fraud predicate acts.

When assessing the sufficiency of the allegations of the Complaint, I have not considered the information contained in the exhibits Plaintiffs submitted along with their response in

---

[11] I note that contrary to Defendants' assertion, Plaintiffs need not allege that the mailings themselves were "misleading." Completely "innocent" mailings can satisfy the mailing element. Schmuck v. United States, 489 U.S. 705, 715 (1989), As such, Plaintiffs are not required to allege that the mailings were themselves inaccurate or fraudulent in some way.

opposition to Defendants' motion to dismiss. See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record"). If Plaintiffs choose to file an amended complaint, they should include the information contained in these exhibits and attempt to set forth additional details regarding the mailings which were made in furtherance of the alleged fraudulent scheme.[12]

### 3. Wire Fraud

The elements of wire fraud are "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of wire transmissions in furtherance of the scheme." Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 105 (3d Cir. 2012).

Defendants argue that Plaintiffs' predicate acts of wire fraud fail because they have failed to allege a plausible scheme to defraud.[13] This argument fails for the reasons discussed above in the context of the plausibility of the enterprise's shared purpose.

Additionally, according to Defendants, Plaintiffs only pled two wire transfers with anything approaching the requisite level of particularity[14] – a transfer of Pottstown funds to

---

[12] Defendants also argue that Plaintiffs' mail fraud allegations fail because, under the various Partnership agreements, Earle was authorized to direct Parke Bank to make the transfers at issue and, therefore, the transfers cannot be fraudulent. This argument raises factual issues which are in dispute and cannot be resolved at this stage.

[13] The Complaint alleges that Defendants "used interstate wire transfers to" unlawfully move Partnership funds and misdirect construction draw funds. (Compl. § 125(a), (b).) This conclusory allegation, taken alone, is not entitled to the presumption of truth.

[14] Defendants also argue that the Complaint fails to set forth the allegations regarding the other transfers with the level of particularity required under Rule 9(b). For the reasons discussed above

Rosedon on July 2, 2008 and a transfer of Peckville funds to Rosedon on February 12, 2009. Defendants contend that even these two transfers are not adequately alleged because the Complaint does not plausibly allege that the transfers were interstate in nature. In support, Defendants note that the location of Rosedon's account is not pled in the Complaint.

Although wholly intrastate use of the mails for fraudulent purposes can constitute a violation of the mail fraud statute, the wire fraud statute is violated only through interstate use of the wires. See Annulli v. Panikkar, 200 F.3d 189, 200 n.9 (3d Cir. 1999) (overruled on other grounds). The Complaint alleges that Parke Bank has its principal place of business in Sewell, NJ and maintains a branch office in Philadelphia, PA. The Complaint also alleges that Pantilione and Gallo maintained their business addresses in Sewell, NJ. The Partnerships are all alleged to have principal places of business in Pennsylvania. At this stage, a reasonable inference from these allegations is that the wire transfers at issue crossed the state line between New Jersey (Parke Bank's principal place of business) and Pennsylvania (the Partnerships' principal place of business). As such, Plaintiffs have pled sufficient facts to support their allegation that Defendants used "interstate" wire transfers in furtherance of the alleged fraudulent conduct.

Next, Defendants argue that the two transfers mentioned above alone do not constitute a pattern of racketeering activity because they occurred less than twelve months apart. See Tabas v. Tabas, 47 F.3d 1280, 1293 (3d Cir. 1995) (collecting cases holding that "conduct lasting no more than twelve months did not meet the standard for closed-ended continuity" for establishing a pattern of racketeering activity).

Defendants' argument suggests that predicate acts of like kind must be viewed in isolation for purposes of determining whether a Complaint alleges a pattern of racketeering

in the context of the mail fraud allegations, I agree. Again, if Plaintiffs choose to file an amended complaint, they should attempt to address these deficiencies.

activity. No precedent directs that a RICO complaint should be subject to the piecemeal review Defendants suggest.

       *c.  Pattern of Racketeering Activity*

     As discussed above, Plaintiffs have failed to adequately allege certain elements of the predicate offenses of bank, mail, and wire fraud. For purposes of completeness, I will also analyze whether those predicate acts, if adequately alleged, would satisfy the pattern requirement.

     A pattern of racketeering activity requires the predicate acts be "related, <u>and</u> that they pose a threat of continued criminal activity." <u>H.J. Inc. v. Nw. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989) (emphasis in original). Predicate acts are "related" when they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>Id.</u> at 240. The continuity requirement can be satisfied by pointing "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." <u>Id.</u> at 241. If a plaintiff alleges a RICO violation over a "closed period ('closed-ended' scheme), she must prove a series of related predicates lasting a 'substantial period of time.'" <u>Hughes v. Consol-Pennsylvania Coal Co.</u>, 945 F.2d 594, 609 (3d Cir. 1991) (quoting <u>H. J.</u>, 492 U.S. at 242). The Third Circuit has interpreted "substantial period of time" to mean at least a period of time in excess of twelve months. <u>Hughes</u>, 945 F.2d at 611.

     Here, viewing the allegations in the light most favorable to Plaintiff, the alleged pattern of racketeering activity satisfies the relatedness requirement. The predicate acts alleged share similar purposes, participants and victims. Plaintiffs allege that predicate acts were committed for the purposes of unlawfully obtaining funds from the Partnerships and funneling them

elsewhere and in accordance with Defendants' financial self-interests. These acts were allegedly committed by the same individual Defendants – Gallo, Pantilione, Earle and Parke Bank – and targeted the same victims – the Partnerships and those involved in their affairs as principals or investors.

Regarding the continuity requirement, the Complaint sufficiently alleges that the predicate acts occurred over a substantial period of time – approximately four years. For these reasons, the Complaint sufficiently alleges a pattern of racketeering activity.

        *d.   <u>Proximate Cause of the Alleged Injury to Phoenix and West Chester</u>*

Defendants urge that Phoenix and West Chester have failed to state a claim under § 1962(c) because the injuries they claim are too attenuated to be deemed to have been proximately caused by Defendants' alleged wrongful conduct.

"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court. . ." 18 U.S.C. § 1964(c). The United States Supreme Court has held that, pursuant to § 1964(c), a plaintiff must make a threshold showing that he suffered an injury to business or property and that the injury was proximately caused by the defendant's racketeering activities. <u>Holmes v. Security Investor Protection Corp.</u>, 503 U.S. 258, 268 (1992). In <u>Holmes</u>, the Supreme Court identified three factors in assessing whether a RICO claim is premised on an injury too remote from the alleged racketeering activity:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can

generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

Id. at 269-270. A plaintiff who complains of "harm flowing merely from the misfortunes visited upon a third person by the defendant's acts" may not recover under § 1964. Id. at 268-69.

Phoenix and West Chester allege that they were injured by Defendants' racketeering activity because they were forced to sell "their respective properties at considerable losses in order to fund the defense of the Pottstown and Peckville partnerships" in lawsuits between those entities and Parke Bank. (Compl. ¶ 112.) While the alleged forced sale of assets constitutes an "injury" to business or property, the Complaint fails to allege facts to plausibly suggest that this injury was proximately caused by Defendants' alleged racketeering activity. Even though Spaeder is involved in all of the Partnerships, Phoenix, West Chester, Pottstown and Peckville are separate legal entities. Nothing in the Complaint explains how Defendants conduct "forced" Phoenix and West Chester to fund the legal defense of two distinct legal entities. The fact that Spaeder was involved in each of the Partnerships does not obviate Plaintiffs of the duty to plead facts which plausibly suggest that the sale of property held by Phoenix and West Chester was proximately caused by Defendants' alleged racketeering activity.[15]

### e.   Count II – Civil RICO – 18 U.S.C. § 1962(b)

In count two, all Plaintiffs bring a claim against all Defendants for a violation 18 U.S.C. § 1962(b) which provides:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

---

[15] Section 1964(c) and the related proximate cause requirement articulated in Holmes apply to all claims brought under § 1962. Therefore, the claims Phoenix and West Chester bring under § 1962(b) and (d) also fail for want of proximate cause.

To state a cause of action under § 1962(b), a plaintiff must allege: "(1) defendant has an interest in an enterprise; (2) defendant gained or maintained that interest through a pattern of racketeering; and (3) the enterprise affects interstate commerce." Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 430 (E.D. Pa. 2014) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1190 (3d Cir. 1993)). Additionally, "a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts." Id.

The enterprise in a § 1962(b) claim is "something acquired through the use of illegal activities or by money obtained from illegal activities." Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994). Therefore, unlike the enterprise in a § 1962(c) claim, the enterprise in a § 1962(b) "is the victim of unlawful activity." Id. (the "enterprise" "in subsection (c) connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity.")

Defendants urge that the Complaint does not allege that the BPGE enterprise is a victim in which Defendants acquired an interest in or control of through racketeering activity. Rather, according to Defendants, the Complaint alleges that the BPGE enterprise is the vehicle through which Defendants allegedly carried out the racketeering activity which victimized Plaintiffs. As such, Defendants contend that Plaintiffs have not stated a claim under § 1962(b).

Plaintiffs present an alternative theory to support their § 1962(b) claim, explaining that the allegations in the Complaint support a theory that Defendants acquired an interest in Pottstown, Peckville and Lionville through a pattern of racketeering activity. In other words, Plaintiffs urge that Pottstown, Peckville and Lionville constitute the enterprises for purposes of their § 1962(b) claim.

The Complaint's allegations to do not support this alternative theory. See Buttermore v. Loans, 2016 WL 308875, at *6 (W.D. Pa. Jan. 25, 2016) (a theory presented in opposition to a motion to dismiss "cannot be deemed adequately pled [where] the facts alleged in the complaint directly contradict it"). The paragraphs setting forth Plaintiffs' § 1962(b) claim clearly allege that Defendants "acquired and/or maintained, directly or indirectly, an interest in or control of the BPGE Enterprise . . ." and Defendants and Earle "by and through their active participation in and/or by exercising control of the BPGE Enterprise, in violation of 18 U.S.C. § 1962(b), caused the Partnerships to be undercapitalized." (Compl. ¶¶ 129, 131) (emphasis added).

Based on the foregoing, the Complaint explicitly alleges that Defendants gained an interest in or control over the BPGE Enterprise, not Pottstown, Peckville and Lionville. Even viewed in the light most favorable to Plaintiffs and taken as a whole, the Complaint does not plausibly allege that the BPGE Enterprise is a victim that Defendants acquired an interest in through racketeering activity. Rather, the gravamen of the Complaint is that Defendants carried out their racketeering activity through the vehicle of the BPGE Enterprise. As such, Plaintiffs have failed to state a claim under § 1962(b).

### f.  Count III – Conspiracy to Engage in Civil RICO – 18 U.S.C § 1962(d)

In count three, all Plaintiffs bring a claim against all Defendants for a violation 18 U.S.C. § 1962(d) which provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

Defendants argue that Plaintiffs' § 1962(d) RICO conspiracy claims fail because Plaintiffs' underlying RICO claims pursuant to § 1962(b) and (c) claims fail. "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962

necessarily must fail if the substantive claims are themselves deficient." Lightning Lube, 4 F.3d at 1191.

As discussed above, there are deficiencies in Plaintiffs' underlying substantive claims that Defendants violated § 1962(b) and (c). As such, Plaintiffs have also failed to state a claim for RICO conspiracy under § 1962(d).

### g.  Count IV – Fraud

In Count IV, Lionville, Pottstown, Peckville and Shea bring a claim against all Defendants for common law fraud.[16] Defendants argue that these fraud claims are barred by the applicable statute of limitations and, alternatively, fail on substantive grounds.

#### i.  *Statute of Limitations*

Under Pennsylvania law, a claim of fraud has a two-year statute of limitations. 42 Pa. Con. Stat. Ann. § 5524(7). Defendants note the Complaint, which was filed on June 19, 2015, alleges that Defendants began their fraudulent conduct in 2008. Therefore, according to Defendants, Plaintiffs' fraud claims are time-barred.

Plaintiffs respond that they did not discover the fraudulent scheme until Defendants produced certain revealing documents in the course of Peckville's bankruptcy proceedings in late

---

[16] While Shea is listed in the caption of Count IV, the substantive paragraphs setting forth the fraud allegations, (Compl. ¶¶ 137-144), do not contain a single reference to Shea. Perhaps, the inclusion of Shea in the caption was in error. If Plaintiffs elect to file an amended complaint, they should rectify this deficiency by either removing his name from the caption or including allegations setting forth his fraud claim.

I also note that the substantive paragraphs, (Compl. ¶¶ 137-144), contain language suggesting that Rhoads and Spaeder are bringing a fraud claim against Defendants. ((Compl. ¶ 142) ("Rhoads reasonably relied on Pantilione's representations to Spaeder and provided Parke Bank with the requested security instruments")); (Compl. ¶ 141) ("Pantilione falsely and fraudulently misrepresented to Spaeder. . .")) However, the caption for Count IV does not list Rhoads or Spaeder as a Plaintiff. If Rhoads and/or Spaeder intend to bring a fraud claim against Defendants, this omission should be corrected in any amended complaint.

2013 or early 2014. As such, Plaintiffs urge that the statute of limitations applicable to the fraud claims was tolled under until that time pursuant to the "discovery rule."[17]

In response to Plaintiffs' invocation of the "discovery rule," Defendants argue that Plaintiffs raised the same allegedly fraudulent conduct that forms the basis of the instant claims in pleadings from other cases filed in 2012 and early 2013. The Complaint was filed on June 19, 2015 and, therefore, Defendants argue that the fraud claims are barred by the statute of limitations.

At this early stage of the litigation, I decline to dismiss Plaintiffs' common law fraud claims on the basis of the two-year statute of limitations. "The discovery rule is a judicially created device which tolls the running of the applicable statute of limitations until the point where the complaining party knows or reasonably should know that he has been injured and that his injury has been caused by another party's conduct." Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000). "In order to determine when the statute should begin to run, the finder of fact focuses on whether the plaintiff was reasonably diligent in discovering his injury." Id. "Pursuant to application of the discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom and experience of jurors." Id. (internal quotations omitted.) The plaintiff bears the burden of showing that the discovery rule tolls the statute of limitations. Schmidt v. Skolas, 770 F.3d 241, 251 (3d Cir. 2014).

While "a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule

---

[17] Plaintiffs also invoke the doctrine of adverse domination as a basis for tolling the applicable statute of limitations. As discussed below, I believe that dismissal based on the statute of limitations is premature at this juncture and, therefore, I need not resolve the adverse domination issue at this time.

that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." Id. (internal citations omitted). The Third Circuit has stated, "in the context of the discovery rule, that when 'the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal.'" Schmidt v. Skolas, 770 F.3d 241, 251 (3d Cir. 2014) (quoting Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 835 (3d Cir. 2011)). However, dismissal may be warranted where a plaintiff "effectively pleads herself out of court by alleging facts that are sufficient to establish the defense." Id. (quoting Jones v. Rogers Mem. Hosp., 442 F.2d 773, 775 (D.C. Cir. 1971)).

The Complaint does not reveal when the statute of limitations period began to run. Nothing in the Complaint clearly confirms the date on which Lionville, Pottstown and Peckville became aware of the conduct that forms the basis of their fraud claims. In other words, the Complaint does not reveal when the limitations period began to run nor does the Complaint contain allegations sufficient to establish Defendants' invocation of the statute of limitations defense. And as Plaintiffs need not plead facts sufficient to overcome this affirmative defense, dismissal of the fraud claim on the basis of statute of limitations is premature and inappropriate.

    *ii.*    *Merits - Fraud*

In addition to the statute of limitations challenge, Defendants argue that the fraud claims brought by Lionville, Pottstown, Peckville and Shea fail on substantive grounds. The elements of fraud are: "(1) a misrepresentation; (2) known to be false; (3) intended to induce action; (4) justifiable reliance on the misrepresentation; and (5) damages as a proximate result." Kutner Buick, Inc. v. Am. Motors Corp., 868 F.2d 614, 620 (3d Cir. 1989) (citing Delahanty v. First Pa. Bank, 464 A.2d 1243, 1252 (Pa. Super. 1983).[18]

---

[18] The Supreme Court has held that, unlike in common law fraud, reliance is not an element of a RICO claim predicated on mail fraud. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661

Defendants urge that the Complaint fails to adequately allege the elements of misrepresentation and reliance with respect to the fraud claim. Defendants contend that the Complaint does not plead any "affirmative misrepresentation" by Defendants to Lionville, Pottstown, Peckville or Shea nor does it plead that Lionville, Pottstown, Peckville and Shea justifiably relied upon any misrepresentation by Parke Bank.

Plaintiffs respond that Defendants' argument rests on an improperly narrow understanding of their claims. Plaintiffs cite to the following actions as examples of the conduct they state forms the basis of their fraud claims: Defendants: (1) transferred funds from Lionville, Pottstown and Peckville's accounts to Rosedon's accounts without authorization; and (2) fabricated construction invoices.

I agree with Defendants that Plaintiffs have not sufficiently alleged the elements of misrepresentation and reliance. If Plaintiffs elect to file an amended complaint, they should endeavor to specify the nature of the alleged misrepresentations and the resulting reliance on those alleged misrepresentations.

### h.   Count V – Conversion

In Count V, Lionville, Pottstown, Peckville and Shea have brought a claim against Parke Bancorp and Parke Bank for conversion.[19]

---

(2008). "[A] plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Id. at 2144.

[19] As with the fraud claim, although the heading indicates that Shea is bringing a conversion claim, nothing in the paragraphs setting forth the claim reference Shea. ((See, e.g., Compl. ¶ 149) ("The actions of Parke Bancorp. Inc. and Parke Bank in converting property that was known to belong to Lionville, Pottstown and Peckville. . .")) If Plaintiffs choose to file an amended complaint, they should either omit Shea's name from the caption or include allegations which explain the basis for his conversion claim.

### i. _Statute of Limitations_

Defendants argue that Plaintiffs' conversion claims are also barred by the statute of limitations. A two-year statute of limitations applies to conversion under Pennsylvania law. 42 Pa. Stat. and Cons. Stat. Ann. § 5524(3); Sabella v. Appalachian Development Corp., 103 A.3d 83, 92 n.3 (Pa. Super. Ct. 2014) (applying § 5524(3) to conversion claims). For the reasons discussed above in the context of Plaintiffs' fraud claims, Defendants' argument to dismiss Plaintiffs' conversion claims on statute of limitation grounds fails.

### ii. _Merits – Conversion_

Additionally, Defendants urge that the conversion claims fail on the merits. Defendants note that the Complaint includes an allegation that Parke Bank converted commercial property held by Lionville, Pottstown and Peckville. Defendants argue that this allegation cannot support the instant claim because real property is not subject to a claim for conversion.

I agree. "[R]eal property cannot be the subject of an action for conversion." Sterling v. Redevelopment Auth. of City of Philadelphia, 836 F. Supp. 2d 251, 270 (E.D. Pa. 2011). Therefore, Lionville, Pottstown and Peckville cannot premise their conversion claims on the forced sale of commercial property owned by those Partnerships.

However, the Complaint also alleges that Parke Bank converted loan proceeds and bank account balances belonging to Lionville, Pottstown and Peckville. These funds constitute personal property and, as such, Lionville, Pottstown and Peckville have sufficiently alleged the nature of the supposedly converted property. MacKay v. Benjamin Franklin Realty & Holding Co., 135 A. 613, 614 (Pa. 1927) (an action for "conversion can be maintained for almost any kind of personalty, including money, notes, bonds, certificates of stock, title deeds, etc").

### i.   <u>Count VI – Civil Conspiracy</u>

In Count VI, each Plaintiff brings a state law claim for civil conspiracy against each Defendant. Defendants have moved to dismiss the conspiracy claims on both statute of limitations and substantive grounds.

#### i.   *Statute of Limitations*

Defendants argue that the civil conspiracy claim is time barred for the same reasons argued in the context of Plaintiffs' claims for fraud and conversion. <u>See</u> <u>In re Asbestos Sch. Litig.</u>, 768 F. Supp. 146, 150 (E. D. Pa. 1991) ("[I]n Pennsylvania a cause of action for civil conspiracy adopts the statute of limitations applicable to the overt act allegedly committed in furtherance of the conspiracy.") For the reasons discussed above in the context of Plaintiffs' fraud and conversion claims, Defendants' argument to dismiss Plaintiffs' conspiracy claims on statute of limitation grounds fails.

#### ii.   *Merits - Conspiracy*

Additionally, Defendants urge that the civil conspiracy claims fail because the underlying torts of fraud and conversion fail. As discussed above, Plaintiffs, in part, have not adequately alleged the underlying torts of fraud and conversion. Therefore, Plaintiffs' conspiracy claims fail as well.

### j.   <u>Prior Pending Action</u>

As a final matter, Defendants argue that, should Spaeder's claims relating to his guarantee of the Pottstown loan survive, they must be dismissed pursuant to the "prior pending action doctrine" because Spaeder is simultaneously litigating these claims in action currently pending in state court.

The prior pending action rule "provides that a party does not have a "right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." <u>Conklin v. Warrington Twp.</u>, 2008 WL 2704629, at *13 (M.D. Pa. July 7, 2008). The rule, however, applies where the two actions are both filed in the "same federal court." <u>Walton v. Eaton Corp.</u>, 563 F.2d 66, 70 (3d Cir. 1977)."[A]s between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976) (internal citations omitted).

Defendants' invocation of the prior pending action doctrine is unavailing because the other action is pending in state court.

**IV.    <u>CONCLUSION</u>**

For the aforementioned reasons, Defendants' motion to dismiss will be granted in part and denied in part. An appropriate Order follows.