**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **DEVON DRIVE LIONVILLE, LP, et al.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **NO.  15-3435** |
| **PARKE BANCORP, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |


**Goldberg, J.**                                                              **November 27, 2017**

## <u>MEMORANDUM OPINION</u>

Plaintiffs, four limited partnerships and two individuals,[1] have sued Defendant Parke Bank and two of its employees,[2] under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §§ 1961, <u>et seq</u>., alleging fraud in connection with a series of large commercial loans and related transactions.  In addition to three RICO claims, Plaintiffs also assert state law claims for fraud, conversion, and civil conspiracy.

On December 29, 2016, I substantially granted Defendants' Motion to Dismiss the Complaint and gave Plaintiffs leave to file an amended complaint.  The Amended Complaint was filed on January 30, 2017.

Defendants have now filed a Motion to Dismiss the Amended Complaint, together with a related Motion to Take Judicial Notice.  Upon consideration of Defendants' Motion and the

---

[1]     Plaintiffs include North Charlotte Road Pottstown, L.P., Main Street Peckville, L.P., Rhoads Avenue Newtown Square, L.P., Devon Drive Lionville, L.P., John Shea, and George Spaeder (collectively, "Plaintiffs").

[2]     Defendants include Parke Bank, Vito S. Pantilione, and Ralph Gallo (collectively, "Defendants").

parties' briefs, I will (1) grant the Motion to Take Judicial Notice in its entirety; (2) grant the Motion to Dismiss as to Plaintiffs North Charlotte Road Pottstown, L.P., Main Street Peckville, L.P., Rhoads Avenue Newtown Square, L.P., and John Shea; and (3) deny the Motion to Dismiss without prejudice as to Plaintiffs Devon Drive Lionville, L.P. and George Spaeder.

## FACTUAL BACKGROUND

### I.    The Formation of the Partnerships

The numerous transactions detailed in the Amended Complaint are nuanced and complicated.  Thus, a detailed understanding of each is required to reach the proper resolution of Defendants' Motion.  The following facts are set forth in the Amended Complaint. [3]

In 2003, Plaintiff George Spaeder ("Spaeder") and non-party Bruce Earle ("Earle") entered into an oral partnership agreement for the purpose of buying and selling real estate (the "Earle-Spaeder Partnership").  (Am. Compl. ¶ 17.)  Spaeder was charged with various tasks such as locating suitable investment properties, negotiating the terms of purchase and eventual sale or lease of the properties, and organizing and overseeing renovation work to the properties when necessary.  (Id.)  Earle took charge of the finances relative to the real estate transactions. Together, the two men formed four of the partnerships that are now Plaintiffs in this lawsuit: Devon Drive Lionville, L.P. ("Lionville"), North Charlotte Road Pottstown, L.P. ("Pottstown"), Main Street Peckville, L.P. ("Peckville"), and Rhoads Avenue Newtown Square, L.P. ("Rhoads Avenue") (collectively the "Partnerships").  (Id. ¶¶ 4–7, 18.)

---

[3]    When determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009).  In accordance with this principle, my recitation of the facts assumes the truth of the factual statements in the Amended Complaint.

These Partnerships were formed to purchase, develop, and lease a single Pennsylvania commercial real estate property capable of hosting multiple commercial tenants.  (Id.)  Although each Partnership had a unique ownership structure comprised of both individual and corporate partners, all were spearheaded by Spaeder and Earle.  (Id. ¶ 18.)  Spaeder was principally in charge of managing the day-to-day business of the Lionville, Pottstown, and Peckville Partnerships,[4] while Earle acted as an independent contractor through his wholly-owned company Rosedon Holding Company Limited Partnership ("Rosedon Holding").  (Id. ¶ 19.)  Rosedon Holding took custody of the books and records of these three Partnerships and monitored their finances.  (Id.)

For the Partnerships to succeed, they needed to obtain commercial loans.  Three of the Partnerships—Lionville, Pottstown, and Peckville—obtained financing through Defendant Parke Bank ("Parke Bank"), a full service commercial bank that provides personal and business financial services to individuals and small-sized businesses in southern New Jersey, Philadelphia, and surrounding Pennsylvania counties.  (Id. ¶ 21.)  Officer and director of Parke Bank, Defendant Vito S. Pantilione ("Pantilione"), was integrally involved in facilitating the loan transactions between Parke Bank and several of the Partnerships.  (Id. ¶ 22.)

Spaeder and Earle first did business with Parke Bank in February 2007 in connection with an unrelated real estate transaction.  Thereafter, when Earle closed a loan with another bank, Pantilione reached out to Spaeder to find out why Earle did not come to Parke Bank for the loan. (Id.)  Pantilione dismissed Spaeder's concerns about federal "loan to one borrower" lending limit regulations, advised that he would handle lending limit issues, and requested that Earle come to him personally at Parke Bank for all future loans related to the real estate ventures.  (Id. ¶ 23.)

---

[4]     The Amended Complaint does not define the management structure of Rhoads Avenue.

## II. Loans from Parke Bank to Lionville, Pottstown, and Peckville

In December 2007, Lionville borrowed $3,098,000 from Parke Bank to finance the purchase and development of vacant ground featuring three commercial "pads." Of the total loan amount, $748,000 was earmarked for anticipated construction costs, while the balance was to cover purchase costs. (Id. ¶ 25.) This loan (the "Lionville loan") was guaranteed by Earle. In connection with the transaction, Parke Bank received a copy of Lionville's Limited Partnership Agreement and Lionville's General Partner Operating Agreement. (Id.)

In March 2008, Pottstown borrowed $8,000,000 from Parke Bank to acquire and renovate a shopping center, with $2.5 million allocated to acquisition costs, $4.146 million allocated to construction/renovation, and $1.354 million allocated to equity recapture. (Id. ¶ 26.) Spaeder signed a personal guaranty for the loan (the "Pottstown loan"), and Parke Bank received a copy of Pottstown's Limited Partnership Agreement and Pottstown's General Partner Operating Agreement. (Id.)

In May 2008, Peckville borrowed $5,200,000 from Parke Bank to fund the purchase and renovation of an existing shopping center, $3.4 million of which was required for purchase and $500,000 of which was earmarked for renovations. (Id. ¶ 27.) On Pantilione's advice, Earle persuaded Joseph Sweeney, who had previously worked with Earle and Spaeder, to sign a guaranty for the loan (the "Peckville loan"). Parke Bank again received a copy of Peckville's Limited Partnership Agreement and Peckville's General Partner Operating Agreement. (Id.)

## III. The John Shea Line of Credit

In mid-2008, Earle went to Pantilione about obtaining a line of credit to provide additional funds for his business ventures. (Id. ¶ 28.) Pantilione identified a property owned by Earle and his wife in Margate, NJ (the "Margate Property") as a source of security for the line of

credit, but explained that Earle could not personally guaranty the line of credit due to lending limit regulations. (Id. ¶28.) As such, Pantilione suggested that Earle find a business associate, specifically identifying Plaintiff John Shea, to personally guarantee the line of credit. (Id. ¶¶ 28–29.) Pantilione explained that although Shea would need to personally guaranty repayment, the real security to Parke Bank would be through the execution of a first-position mortgage on Earle's Margate Property in favor of Parke Bank. (Id. ¶ 29.)

Eventually, Earle approached Shea about his willingness to guarantee the line of credit. (Id. ¶ 31.) In a subsequent meeting, Pantilione represented to Shea that Parke Bank viewed the real security for the line of credit to be the mortgage on the Margate Property, and that $2,350,000 of the funds available through the line of credit would be used as additional cash collateral to help improve the collateralization of the Lionville, Pottstown, and Peckville loans. (Id. ¶ 32.) In reliance on these representations, Shea agreed to enter into the line of credit agreement and guarantee the funds ("Shea LOC"). (Id. ¶ 33.) This transaction closed in October 2008.

## IV.    Discovery of the Alleged RICO Enterprise

By late 2011, Earle's and Spaeder's relationship had deteriorated and their business partnership began to collapse. (Id. ¶ 34.) Around that time, the loans from Parke Bank to the Pottstown and Peckville Partnerships went into default. (Id.) In 2012, Parke Bank confessed judgment in the Court of Common Pleas of Delaware County, Pennsylvania against Pottstown in the amount of $9,762,357.86, and against Peckville in the amount of $5,612,169.45. Also at that time, the state court entered an order prohibiting Spaeder from continuing in his management role for the Lionville, Pottstown, and Peckville properties or from having any involvement in the affairs of those entities. (Id. ¶ 35.) Rosedon Holding and Earle also defaulted on other loans

from Parke Bank, which were pursued by Parke Bank through confessed judgments entered in several state court actions.  (Id. ¶ 36.)

In February 2013, Spaeder and other principals of some of the Partnerships attended a hearing held in one of the lawsuits brought by Parke Bank against Earle.  During that hearing, Earle testified regarding a "global settlement" of the claims against him, which included a provision allowing Parke Bank to cross-collateralize funds between Rosedon Holding, Pottstown, Peckville, and Rhoads Avenue without prior consent or authorization.  (Id. ¶ 37.)  As a result of that testimony, Spaeder and the other principals of the Partnerships petitioned the court to intervene in order to object to the proposed settlement since Earle was not authorized to make decisions affecting the assets of the Partnerships.  (Id. ¶ 38.)  At a subsequent hearing on the intervention, Parke Bank withdrew its motion to enforce its global settlement with Earle.  (Id.)

Spaeder later sought to strike a deal with Parke Bank, through Pantilione, to cure Peckville's default and avoid a Sheriff's Sale of the Peckville property.  Pantilione refused to negotiate and indicated Parke Bank was going to use the equity from the sale of the Peckville property to help prop up other loans.  (Id. ¶ 39.)  Spaeder then filed for bankruptcy.  During the ensuing bankruptcy proceedings in July 2013, the Partnerships began to uncover evidence of an "enterprise" among Parke Bank, Pantilione, Defendant Ralph Gallo (Senior Vice President and Chief Workout Officer for Parke Bancorp, Inc.), and Earle (collectively, the "BPGE Enterprise").  (Id. ¶¶ 2, 13, 39.)

## V.      Alleged Activities by the BPGE Enterprise

Parke Bank personnel allegedly participated in the BPGE Enterprise when they began to utilize the funds available under the loans and/or lines of credit extended to the various

independent limited partnership entities as one "piggy bank." (Id. ¶ 50.)  This piggy bank would purportedly fund troubled loans to create the appearance of a performing loan.  (Id.)

Despite the fact that the Lionville, Pottstown, and Peckville Partnerships were separate legal entities with different assets and ownership, Parke Bank treated these loans as if they were three loans to the same borrower, controlled by Earle, such that their loans could be cross-collateralized by Parke Bank as it saw fit.  (Id. ¶ 53.)  Parke Bank, however, was not authorized to commingle the entities' funds or cross-collateralize their loans.  (Id. ¶ 54.)  Earle, who controlled the financial information for these three partnerships and who was also in control of the proceeds of the Shea LOC, misdirected and misappropriated loan funds and/or rental income to benefit his own interests and those of Parke Bank, Pantilione, and Gallo.  (Id. ¶ 55.)  For example, the Amended Complaint claims that Earle carefully safeguarded the Partnerships' books and records and actively prevented Spaeder from having access to them.  (Id. ¶ 56.)  Earle also allegedly ensured that correspondence from Parke Bank concerning the Shea LOC or the loans to Lionville, Pottstown or Peckville were only sent to Rosedon Holding's offices and were not forwarded to Spaeder or Shea.  (Id. ¶ 57.)  For their part, Pantilione and Gallo improperly lulled Spaeder into a false sense of confidence that their actions were lawful and in the best interests of the Partnerships.  (Id. ¶ 55.)

## VII.    Alleged Specific Fraudulent Activity Regarding Each Partnership/Loan

### A.    The Lionville Partnership

Under the Limited Partnership Agreement for Lionville, all management and decision-making authority was vested exclusively in the general partner entity, Devon Drive Lionville GP, LLC.  (Id. ¶ 65.)  The sole limited partner of Lionville—Earle—was expressly prohibited from having any right or authority to manage, control, act for, or obligate Lionville.  (Id.)  The

Operating Agreement vested management control over all decisions of the general partnership in Spaeder.

Lionville's $3,098,000 loan from Parke Bank facilitated its purchase and a portion of construction costs associated with commercial real estate located at 120 Eagleview Boulevard in Lionville, PA for occupancy by tenants. (Id. ¶ 67.) Beginning as early as January 2008, however, Parke Bank began to transfer funds by wire from Lionville to other Parke Bank accounts and, predominantly, to an outside bank account for Rosedon Holding, all without Lionville's consent or approval. (Id. ¶ 68.) In three separate transactions between January 2008 and January 2009, Parke Bank wired a total of $1,416,450.70 from Lionville's account to Rosedon Holding. (Id. ¶ 68.) Of the total funds transferred without Lionville's authorization, Parke Bank directed the return of $48,531.97 into Lionville's account, resulting in a shortfall of $1,608,197.08. (Id. ¶ 69.)

Parke Bank, through Pantilione and/or Gallo, also allegedly facilitated the transfer of additional funds to Rosedon Holding by honoring forged or unsigned checks made payable to Rosedon Holding and drawn against Lionville's account at Parke Bank. (Id. ¶ 71.) Plaintiffs allege that these payments were made to provide Earle with additional liquid funds while avoiding lending limits. (Id. ¶ 72.)

Unaware of these transactions, Lionville, through Spaeder, entered into a long-term lease with Rite-Aid in December 2009, which required Lionville to construct a building per Rite-Aid's specifications. (Id.) Thereafter, in January 2010, Lionville entered into a long-term lease with a restaurant named Timothy's of Lionville ("Timothy's"). (Id.) At Pantilione's suggestion, Lionville pursued refinancing through Parke Bank to obtain funds for the construction of the Rite Aid building and the Timothy's location. (Id.) Pantilione agreed to refinance the Lionville loan

on the condition that Earle reduce his ownership interests in Lionville so that Parke Bank would not run afoul of lending limitations. (<u>Id.</u> ¶ 74.) In December 2010, Lionville closed on a new loan with Parke Bank for $6,700,000 with a guaranty from a minority partner, Jerry Naples. (<u>Id.</u>) The proceeds were used to pay off the first loan to Parke Bank and the construction costs of the Rite-Aid building, leaving approximately $1.8 million for the Timothy's restaurant construction. (<u>Id.</u>) At Pantilione's direction, however, Parke Bank refused to release any funds for construction unless Earle was completely removed from Lionville's ownership. (<u>Id.</u> ¶ 75.)

In September 2011, Gallo, who was at the time a Vice President at Parke Bank, approved payment on an allegedly fraudulent A1A form in the amount of $105,882, and directed payment from Lionville's construction loan account to Rosedon Holding, despite knowing that the money did not correspond to any construction cost incurred. (<u>Id.</u> ¶ 76.) Upon receipt of the $105,882 from the Lionville construction loan account, Rosedon Holding transferred the majority of the funds from its account back to Parke Bank as payment on several past-due mortgage loan obligations, including the loan for Lionville. (<u>Id.</u> ¶ 77.)

Due to the delays in construction caused by Parke Bank's decision to hold Lionville's funds hostage, Timothy's restaurant terminated its lease. (<u>Id.</u> ¶ 80.) Although Lionville eventually regenerated Timothy's interest, the terms of the new lease were significantly less favorable. (<u>Id.</u>) In the meantime, the construction delays caused Lionville to lose another prospective tenant. (<u>Id.</u>) In February 2014, Lionville refinanced its Parke Bank loan with WSFS Bank and finally had access to the funds necessary to begin improvements on the property. (<u>Id.</u>)

On at least one occasion in 2009, and on at least two occasions in 2010, Parke Bank assessed Lionville with a "Late Charge" of $99,999.99, each of which was later "waived" by Parke Bank. (<u>Id.</u> ¶ 82.) Lionville never received notice of the assessment of the late charges, nor

were they justified. (Id. ¶ 83.) Plaintiffs allege that these sums were to create the false appearance of additional receivables on its books without triggering the additional scrutiny that accompanies transactions of $100,000 or more. (Id.)

**B.    The Pottstown Partnership**

Like Lionville, the Limited Partnership Agreement for Pottstown vested all management and decision-making authority in the control of its general partner entity, North Charlotte Pottstown GP, LLC. Earle was expressly prohibited from having any right or authority to manage Pottstown. (Id. ¶ 85.) The Operating Agreement vested Spaeder with management control over all decisions of the general partnership. (Id. ¶ 86.)

In March 2008, Pottstown secured an $8,000,000 loan in connection with its acquisition of the property at 1400 North Charlotte Street, Pottstown, PA. (Id. ¶ 87.) The plan for that property was to completely renovate the existing shopping center using $4,146,000 of earmarked funds and then lease the space. (Id.)

As with Lionville, Parke Bank allegedly began to unilaterally initiate wire transfers of Pottstown funds to Rosedon Holding and other Parke Bank accounts just months after the loan closed. (Id. ¶ 88.) By the end of 2008, Parke Bank had authorized at least eight such wire transfers, depleting Pottstown's account by $1,225,000. (Id. ¶ 89.) At least thirteen more wire transfers occurred through as late as August 8, 2013. (Id.) Plaintiff alleges that the total amount of unreturned funds wired out of Pottstown's accounts totaled $1,123,809.74. (Id. ¶ 90.)

Parke Bank, through Gallo, was tasked with inspecting, approving, and then releasing construction draws to pay approved A1A work invoices out of the $4.1 million of earmarked loan funds. Gallo, however, caused Parke Bank to authorize the release of Pottstown construction draw funds directly to Rosedon Holding's own checking account without

authorization from Pottstown. (<u>Id.</u> ¶¶ 91–92.) On numerous occasions after Rosedon Holding received the funds, Earle would direct payment of only a portion of the funds to the construction company as payment and would keep the rest. (<u>Id.</u> ¶ 93.) He would then blame the shortfall on Parke Bank and promise that the difference would be made up in later draw payments. (<u>Id.</u>) Relying on Earle's statements, Spaeder, on multiple occasions, paid the contractors using his own funds with the intent of being later reimbursed. (<u>Id.</u>) In total, Parke Bank allegedly misdirected approximately $3,770,000 of Pottstown's $4,100,000 construction draw funds, with Earle, through Rosedon Holding, as the primary recipient. (<u>Id.</u> ¶ 94.)

During calendar years 2010 and 2011, additional funds in the amount of $160,500 were provided to Rosedon Holding by payment approved by Parke Bank on forged or unsigned checks from Pottstown's accounts. (<u>Id.</u> ¶ 96.) Parke Bank also approved payment to itself through two forged checks totaling approximately $88,000. (<u>Id.</u>)

In May 2008, Spaeder negotiated and executed a twenty-year lease with Planet Fitness concerning a large portion of the property. (<u>Id.</u> ¶ 97.) On March 31, 2009, Bottom Dollar signed a twenty-year lease as Pottstown's anchor tenant. (<u>Id.</u>) Planet Fitness began paying rent in March 2010, and Bottom Dollar began paying rent in December 2010. (<u>Id.</u>) Around that time, Pottstown had several additional prospective tenants poised to enter leases. (<u>Id.</u>)

When Bottom Dollar attempted to obtain permits for the interior renovations required to ready its leased space, the local municipality advised it that no permits would issue until Pottstown posted a bond to cover the cost of off-site roadwork. (<u>Id.</u> ¶ 98.) As this work was not in the budget, Pottstown, through Spaeder and a local land use attorney, Marc Kaplin, approached Pantilione about obtaining a letter of credit to fund the bond. (<u>Id.</u> ¶ 99.) Pantilione demanded that Pottstown post additional collateral before Parke Bank would agree to fund the

line of credit. (Id.) Following some negotiations, Pantilione and/or Gallo requested that Pottstown agree to direct its tenants to send their monthly rent checks to a lockbox controlled by Parke Bank. Spaeder agreed to the request. (Id. ¶ 100.) Before Pottstown could resolve the bond issue with the municipality, Parke Bank, over Spaeder's and Kaplin's objections, sent a letter to Bottom Dollar and Planet Fitness announcing "a change in the banking relationship" that required the tenants to send future rent payments to a Parke Bank lockbox. (Id. ¶ 101.) Shortly thereafter, Bottom Dollar cancelled its lease and stopped paying rent, triggering similar reactions by the other prospective tenants. (Id. ¶ 102.) Ultimately, Pottstown defaulted on its loan obligations to Parke Bank, which confessed judgment against it in December 2012, sold the property at a Sheriff's Sale, and continues to pursue a deficiency judgment against Pottstown and its guarantors. (Id. ¶ 104.)

## C. The Peckville Partnership

The Limited Partnership Agreement for Peckville vested all management and decision-making authority in the control of its general partner entity, Main Street Peckville GP, LLC. Earle was expressly prohibited from having any right or authority to manage. (Id. ¶ 105.) The Operating Agreement vested management control over all decisions of the general partnership in Spaeder. (Id. ¶ 106.)

Peckville received a loan from Parke Bank in the amount of $5,200,000, in connection with its acquisition of an existing shopping center located on Main Street in Peckville, PA on May 1, 2008. Peckville intended to stabilize the existing commercial leases on the property and lease out vacant space to new tenants. (Id. ¶ 107.)

As it did with the other Partnerships, Parke Bank began wire transferring Peckville's funds to Rosedon Holding, beginning with a substantial transfer of $1,077,742.83 on February

12, 2009.  (Id. ¶ 108.)  Between 2011 and as recently as September 2013, Parke Bank transferred additional Peckville funds out of its account.  (Id.)  None of these transfers were properly authorized by Peckville.  (Id. ¶ 109.)

Additionally, over the course of approximately three months during 2011, Parke Bank authorized payment to Rosedon Holding on six unsigned or fraudulently-executed checks drawn against the Peckville account, through which Rosedon Holding converted a total of $56,400 from Peckville.  (Id. ¶ 111.)

Parke Bank also engaged in a unilateral modification of Peckville's loan terms.  The original terms of Peckville's loan with Parke Bank required interest-only monthly payments with a maturity date of May 1, 2010.  (Id. ¶ 112.)  Peckville did not pay off the loan by that date.  (Id.) On May 6, 2010, Parke Bank sent a letter to Peckville advising that its note would automatically renew for one year, establishing a new maturity date of May 1, 2011, and assessing an "Extension Fee" of $52,000 against Peckville.  (Id. ¶ 113.)  On May 26, 2011, Parke Bank mailed a "Loan Extension Agreement," this time requesting Peckville's consent to extend the maturity date on its loan to August 1, 2011, in exchange for payment of fees totaling $77,000 and Peckville's agreement to convert its monthly payments to a fixed principal and interest payment totaling $38,289.09.  (Id. ¶ 114.)  Even though Peckville never signed the Loan Extension Agreement, Parke Bank charged the $77,000 late fee and proceeded to collect the principal plus interest payment.  (Id.)  In September 2011, Pantilione and/or Gallo requested that Peckville voluntarily agree to direct its tenants to pay their monthly rent into a lockbox controlled by Parke Bank, and Spaeder agreed to the request.  (Id. ¶ 115.)  Subsequent Loan Modification Agreements that were mailed to Peckville "C/O Bruce Earle" were not provided by Earle to the partners of Peckville and were never signed.  (Id. ¶ 116.)  Therefore, Parke Bank continued to

charge a monthly principal and interest payment to Peckville based on the unsigned and unapproved Loan Extension Agreement. (Id.)

By consent order dated February 12, 2013, Parke Bank became the mortgagee-in-possession of the Peckville property. (Id. ¶ 117.) Rather, than hire a professional management company to collect rent, Parke Bank simply picked up payments in its lockbox. Parke Bank failed to collect over $400,000 in rent, pass through costs, and other fees. (Id. ¶ 118.)

On at least two occasions in 2011, Parke Bank assessed Peckville with "Late Charges" of $99,999.99 each. On both occasions, the Late Charge was waived by Parke Bank without Peckville ever receiving notice of the assessment. (Id. ¶¶ 119–20.)

**D.    The Rhoads Avenue Partnership**

In October 2011, Parke Bank was allegedly under scrutiny by the FDIC concerning the severe under-collateralization of Pottstown. (Id. ¶ 123.) Pantilione advised Spaeder that Pottstown must immediately either present additional collateral for the Pottstown loan to cover the collateral shortfall, or Parke Bank would have to "charge off" $5,000,000, forcing the Pottstown loan into default. (Id. ¶ 124.) Pantilione suggested the additional collateral should come from Rhoads Avenue, which did not have any outstanding loans or prior dealings with Parke Bank. (Id. ¶ 125.) Pantilione promised he would not record or perfect any security instruments, or use any such additional collateral. Rather, he simply wanted to show the additional collateral to the FDIC examiners. (Id. ¶ 126.)

On October 25, 2011, Parke Bank's attorney circulated draft security instruments to Spaeder, on behalf of Rhoads Avenue, which included a leasehold mortgage, assignment of rents, and guaranty agreement (the "Rhoads-Pottstown Security Agreements"). (Id. ¶ 127.) At the time these Agreements were requested, Pantilione was aware that Rhoads Avenue's

underlying ground lease and sublease with subtenant Eckerd Corporation was not recorded, Eckerd was not yet due to pay any rent, construction on the property was not underway, and Rhoads Avenue had not yet obtained state and local approvals to develop the property. (Id. ¶ 128.) Relying on Pantilione's representations that Parke Bank would never use the Rhoads-Pottstown Security Agreements, Rhoads Avenue executed these Agreements and delivered them to Pantilione, who presented them to the FDIC. (Id. ¶¶ 129–31.) Contrary to his representations, however, Pantilione caused each of the Agreements to be recorded in Delaware County, and Parke Bank subsequently used them to secure a judgment by confession against Rhoads Avenue. (Id. ¶ 132.)

### E. The Shea Line of Credit

Before Shea executed any guaranty of the Shea line of credit, Parke Bank represented that $2,350,000 of the $5,000,000 available through the Shea LOC would be deposited into the Lionville, Pottstown, and Peckville accounts to serve as additional cash collateral. (Id. ¶ 134.) Ultimately, however, none of the funds went to these Partnerships' accounts, notwithstanding the fact that Parke Bank's records reflected a pay out of all $5,000,000 available. (Id. ¶ 135.)

On at least six occasions from 2009 to 2011, Parke Bank assessed Shea, via the Shea LOC, with "late charges" of $99,999.99 each. (Id. ¶ 138.) On three other occasions in 2012, Parke Bank assessed additional late charges in varying amounts, all just under $78,000. (Id. ¶ 141.) The late charge of March 9, 2012 was "waived" by Parke Bank four days after it was issued, but the other two were not waived, allowing Parke Bank to collect in excess of $155,000 from these late charges.

## VIII.  Procedural History

Plaintiffs originally filed this lawsuit on June 19, 2015.  I dismissed most of the claims without prejudice and granted Plaintiffs leave to amend their Complaint.[5]  <u>Devon Drive Lionville, L.P., et al. v. Parke Bancorp, Inc., et al.</u>, No. 15-3435, 2016 WL 475816 (E.D. Pa. Dec. 29, 2016).  Plaintiffs then filed an Amended Complaint against Defendants Parke Bank, Pantilione, and Gallo on January 30, 2017, setting forth six counts as follows:  (1) conduct and participation in an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) acquisition and maintenance of an interest in and control of an enterprise engaged in a pattern of racketeering activity in violation of RICO; (3) conspiracy to engage in a pattern of racketeering activity in violation of RICO; (4) common law fraud; (5) conversion; and (6) civil conspiracy.[6]

On March 17, 2017, Defendants filed the Motion to Dismiss the Amended Complaint currently at issue and an accompanying Motion for Order to Take Judicial Notice.  Plaintiffs responded to both Motions on May 3, 2017.

### DEFENDANTS' MOTION TO TAKE JUDICIAL NOTICE

Defendants request that I take judicial notice of certain adjudicative facts in the form of judgments, decisions, settlement agreements, and pleadings in state court proceedings, as well as publicly-filed documents including a mortgage and security agreement and an assignment of rents.  According to Defendants, these documents establish a basis for dismissal of Plaintiff's

---

[5]      The only remaining claim after my ruling was the conversion cause of action by Lionville, Pottstown, and Peckville.

[6]      Notably, in the Amended Complaint, two of the partnerships—VG West Chester Pike, L.P. and 1301 Phoenix, L.P.—dropped out as Plaintiffs.

substantive claims under a res judicata defense.  Upon consideration of both parties' briefs, as well as their briefs filed in connection with the prior Motion to Take Judicial Notice, I will grant the Motion and take judicial notice of all of Exhibits A–O attached to the Motion.

Federal Rule of Evidence 201(b) permits a district court to take judicial notice of facts that are "not subject to reasonable dispute" in that they are either (1) "generally known within the territorial jurisdiction of the trial court" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The United States Court of Appeals for the Third Circuit has instructed that judicial notice "should be done sparingly at the pleadings stage" and "[o]nly in the clearest of cases."  Victaulic Co. v. Tieman, 499 F.3d 227, 236 (3d Cir. 2007).  Thus, judicial notice is improper if a legitimate question exists as to the underlying source of the information.  In re Synchronoss Secs. Litig., 705 F. Supp. 2d 367, 390 (D.N.J. 2010) (citing Hinton v. Dep't of Justice, 844 F.2d 126 (3d Cir. 1988)); see also Oneida Indian Nation of New York v. State of N.Y., 691 F.2d 1070 (2d Cir. 1982)).  Nonetheless, Rule 201(c)(2) requires that a district court take judicial notice "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(c)(2); see also Gilliam v. Holt, No. 07-359, 2008 WL 906479, at *3 (M.D. Pa. Mar. 31, 2008) ("Judicial notice is mandatory only where a party requests that it be taken and supplies the necessary information.").

Questions of judicial notice under Rule 201(c)(2) often arise when, like in the case before me, a party puts forth the defense of res judicata, also known as claim preclusion.  Where the defense of res judicata is raised for adjudication on a motion to dismiss, the court can take notice of all facts necessary for the decision and adjudicate that defense.  Toscano v. Conn. Gen. Life Ins. Co., 288 F. App'x 36, 38 (3d Cir. 2008).  "Specifically, a court may take judicial notice of

the record from a previous court proceeding between the parties." Id. (citing Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 416 n.3 (3d Cir. 1988)).

More recently, the Third Circuit has emphasized that "[i]n the context of deciding a Rule 12(b)(6) motion that raises [res judicata] concerns, and where a plaintiff has not included the existence or substance of the prior adjudications in the body of, or attachments to, its complaint, it is axiomatic that a court must still consider the prior adjudication in order to determine whether [res judicata] bars that plaintiff's claims." M & M Stone Co. v. Pa., 388 F. App'x 156, 162 (3d Cir. 2010). Thus, "a prior judicial opinion constitutes a public record of which a court may take judicial notice." Id.; see also Lewis v. O'Donnell, 674 F. App'x 234, 237 (3d Cir. 2017) (reviewing complaint and state court documents submitted by the defendants with their motion to dismiss to affirm district court's finding of res judicata). The same holds true for a judicially-approved settlement. See Karatzas v. Mass Mut. Fin. Grp., No. 16-1302, 2016 WL 6953421, at *2 (D.N.J. Nov. 28, 2016) (taking judicial notice of a judicially-approved settlement).

And as pertinent here, the Third Circuit has expressly noted that a court may take judicial notice of public records, such as publicly recorded deeds. Gagliardi v. Kratzenberg, 188 F. App'x 86, 89 (3d Cir. 2006); see also Sarsfield v. Citimortgage, Inc., 707 F. Supp. 2d 546, 559 n.2 (M.D. Pa. 2010) (finding it proper to consider the mortgage between the parties because it was recorded in the County Recorder of Deeds and, therefore, was a matter of public record that could be considered by the court in deciding a Rule 12(b)(6) motion).

Defendants' original Motion to Dismiss the first complaint was granted primarily because of pleading defects. Devon Drive Lionville, 2016 WL 7475816. In that motion, Defendants also requested that I take judicial notice of various judgments, decisions, pleadings, dockets, settlements, and releases from the various prior court proceedings for purposes of their res

judicata and collateral estoppel defenses. Plaintiffs responded, and I agreed, that it would be improper to consider the documents "cherry-picked" by Defendants without a more complete and accurate record of the prior court proceedings. Id. at *5–6. Rather than conduct an extensive judicial notice/res judicata analysis, I instead granted Defendants' motion to dismiss without prejudice to replead with sufficient facts. [7]

Defendants' current Motion to Dismiss the Amended Complaint again presents a set of documents from state court records, which Defendants urge are proper for judicial notice.[8] I now

---

[7]     In my previous Opinion denying the Motion to Take Judicial Notice, I relied in part upon Victaulic Co. v. Tieman, 499 F.3d 227 (3d Cir. 2007), which stated that judicial notice should be done sparingly at the pleading stage. Id. at 236. Upon further consideration, I now conclude that such reliance was perhaps in error. The Third Circuit's refusal to affirm the District Court's use of judicial notice in Victaulic is distinguishable from the situation here. In that matter, the District Court took judicial notice of the plaintiff's website to establish certain facts about the company's business and then used the "facts" from that corporate website to draw inferences against the non-moving party and find that the company's covenant not to compete was reasonable and protected legitimate confidential information. Id. at 236. The Third Circuit found that the District Court had improperly taken notice of the company's unauthenticated marketing material to resolve an inherently factual affirmative defense. Id. Unlike the present case, Victaulic did not address taking judicial notice of prior judicial proceedings for purposes of addressing a res judicata defense.

I also relied on Kaiser v. Steward, No. 96-6643, 1997 WL 476455 (E.D. Pa. Aug. 19, 1997). There, the court declined to consider the defendants' argument that the plaintiff's RICO claims were "barred by reason of a prior binding release, or collateral estoppel as well as res judicata." Id. at *21 n.28. The court reasoned that the documents relied upon were outside the complaint and outside the public record, and therefore could not be considered unless the motion was converted into one for summary judgment. Id. The present case is distinguishable as the state court records at issue here are within the public record and may unequivocally be considered without converting the motion to dismiss into one for summary judgment.

[8]     Plaintiffs argue that both Defendants' Motion to Take Judicial Notice and their res judicata argument raised in the new Motion to Dismiss, are nothing more than motions to reconsider my prior denial of the Motion to Take Judicial Notice. I disagree. In my December 29, 2016 decision, I never considered the merits of the res judicata defense. Rather, I dismissed without prejudice almost all of the claims of the Complaint under Rule 12(b)(6), and gave Plaintiffs leave to file an Amended Complaint. At that juncture, Defendants could not have filed a motion for reconsideration as the original Complaint had been dismissed. The subsequent

conclude that judicial notice is proper as to all of the exhibits attached to Defendants' Motion to Take Judicial Notice.

First, Exhibits A to M of Defendants' Motion to Dismiss comprise part of a public judicial record in state court. As set forth above, when deciding a motion to dismiss based on res judicata, the court may take judicial notice of the record from a previous court proceeding between the parties. Toscano, 288 F. App'x at 38; see also Jones v. Gemalto Inc., No. 15-0673, 2015 WL 3948108, at *5 (E.D. Pa. June 29, 2015). Accordingly, I will take judicial notice of these exhibits.[9]

With respect to Exhibits N and O, I also find that they are entitled to judicial notice and may be considered with respect to the res judicata defense. As both of these exhibits were recorded with the Delaware County Recorder of Deeds, they are matters of public record proper for judicial notice and consideration with respect to the Motion to Dismiss.

In granting the Motion to Take Judicial Notice, I emphasize that such notice "serves only to indicate what was in the public realm at the time, not whether the contents of those documents are true." U.S. ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 139–40 (E.D. Pa. 2012) (citing Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt., L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006); DCIPA, LLC v. Lucile Slater Packard Children's Hosp. at

---

filing of the Amended Complaint triggered the submission of a new pleading on which Defendants were entitled to re-raise their res judicata arguments.

[9] In their Motion, Defendants argue that judicial notice is not required because Plaintiffs affirmatively plead the existence of these state court records in their Amended Complaint. Defendants are correct that when deciding a motion to dismiss, a court may consider a document "integral to or explicitly relied upon in the complaint." In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); see also In re NAHC, Inc. Secs. Litig., 306 F.3d 1314, 1331 (3d Cir. 2015). The Amended Complaint in this case does explicitly reference many of the state court judgments and pleadings at issue. Because I find that judicial notice of the documents is proper, I need not definitively address this argument.

*Stanford*, 868 F. Supp. 2d 1042, 1048 (D. Or. 2011) ("[T]aking judicial notice of certain documents does not demonstrate the truth of everything contained in those records, and, as such, the truthfulness and proper interpretation of the document are disputable.")). With that caveat in mind, I will consider these documents in ruling on the pending Motion to Dismiss.

## MOTION TO DISMISS

### I. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for

well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'" Id. (quoting Iqbal, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 556 U.S. at 679).

Claims of fraud, either standing alone or as predicate acts for a RICO claim, are subject to the heightened requirements of Federal Rule of Civil Procedure 9(b). Warden v. McLelland 288 F.3d 105, 114 n.6 (3d Cir. 2002). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (citation omitted). Plaintiffs may satisfy this requirement by pleading the "date, time and place" of the alleged fraud or "otherwise inject precision or some measure of substantiation into a fraud allegation." Id.

## II.    Res Judicata

Defendants seek dismissal of the entire Amended Complaint on the grounds of res judicata. Res judicata, also known as claim preclusion, bars a subsequent suit where there has been: "(1) a final judgment on the merits in a prior suit involving (2) the same claim and (3) the same parties or their privies." E.E.O.C. v. U.S. Steel Corp., 921 F.2d 489, 493 (3d Cir. 1990). "The doctrine of res judicata bars not only claims that were brought in a previous action, but also claims that could have been brought." Marmon Coal Co. v. Dir., Office of Workers' Comp. Programs, 726 F.3d 387, 394 (3d Cir. 2013). Res judicata "encourages reliance on judicial

decisions, bars vexatious litigation, and frees the courts to resolve other disputes." Brown v. Felsen, 442 U.S. 127, 131 (1979).

Defendants allege that all of the claims raised by Plaintiffs in the current action were previously litigated to final, binding dispositions in state court, meaning that they may not now be relitigated in federal court. Plaintiffs respond that Defendants have failed to establish that all of the elements required for the application of res judicata are present. Addressing these competing arguments as to each of the Plaintiffs, I find that res judicata bars the claims of Pottstown, Peckville, Rhoads Avenue, and Shea, but does not bar the claims of Lionville and Spaeder.

**A.** **The Pottstown, Peckville, and Rhoads Avenue Claims**

As noted above, Plaintiffs Pottstown, Peckville, and Rhoads Avenue were all subject to state court confessed judgments. To analyze the merits of Defendants' res judicata argument, I will first review both the state court proceedings and current federal claims for each of these Plaintiffs, and then jointly consider whether the confessed judgments satisfy the elements of res judicata.

1.    Pottstown

a.    *State Court Proceedings*

In late 2012, Parke Bank obtained a confession of judgment against the Pottstown Partnership on the loan Parke Bank had extended. (Defs.' Mot. to Dismiss, Ex. A.) Immediately thereafter, Pottstown filed a petition to strike off and/or open judgment by confession. (Defs.' Mot. to Dismiss, Ex. D.) There, Pottstown explicitly argued that the confessed judgment should be opened because Parke Bank misapplied loan proceeds and income, thereby casting serious doubt on both the amount and validity of the outstanding debt. (Id. ¶ 43.) The Pottstown

petition went on to enumerate how Parke's administration of Pottstown's loan was "fraught with error, ignorance, and potential fraud," and was done "in a manner designed to artificially inflate the balance on the North Charlotte Loan." (Id. ¶ 57.) In particular, Pottstown alleged that:

- The terms of the loan required that the budget on each project be balanced and that there be sufficient financing to complete the project before the Bank would make advances. Parke Bank failed, however, to inspect and monitor the projects before making advances on the loans, and advanced far more money than was needed to finance renovations of the property for which the loan was made. (Id. ¶¶ 16–19.)

- Parke Bank misapplied funds and failed to provide any disclosure to [Pottstown] regarding the details of the Interest Reserve or Equity Reserve accounts. The Bank appears to have failed to apply rents from the Premises as required. The Bank also failed to apply $150,000 in funds from the John Shea Loan to the [Pottstown] loan as necessary. (Id. ¶ 50.)

- Between October of 2011 and June 2012, Parke Bank applied, without authority, Pottstown's rent collections to other loans and/or transferred to other accounts for non-Pottstown loans. (Id. ¶ 62.)

- Parke Bank failed to apply funds from its loan to John Shea to the Pottsville loan in the manner required by the loan documents. (Id. ¶ 64.)

On June 18, 2013, upon consideration of these arguments, the state court declined to open the confession of judgment. (Defs.' Mot. to Dismiss, Ex. A.)

*b.    Federal Court Claims*

Similar to the petition to reopen the confessed judgment, the federal RICO claims and state law claims of fraud, conversion, and civil conspiracy in the federal Amended Complaint are premised on the assertion that, in March 2008, Pottstown secured an $8,000,000 loan from Parke Bank. Just months after the loan closed, Parke Bank began to unilaterally initiate wire transfers of Pottstown Partnership funds to Rosedon Holding and other Parke Bank accounts, amounting

to at least twenty-one wire transfers occurring through as late as August 8, 2013.  In addition, although Parke Bank, through Gallo, was tasked with inspecting, approving, and then releasing construction draws to pay approved work invoiced, Parke Bank allegedly authorized the release of Pottstown construction draw funds without authorization from Pottstown.  During 2010 and 2011, additional funds were provided to Rosedon Holding or Parke Bank by payment approved by Parke Bank on forged or unsigned checks from Pottstown's accounts.  Finally, Parke Bank allegedly directed Pottstown's tenants to send future rent payments to a Parke Bank lockbox.

        2.     <u>Peckville</u>

        *a.*     *State Court Proceedings*

Parke Bank confessed judgment against Peckville on December 14, 2012 in the Court of Common Pleas for Delaware County.  (Defs.' Mot. to Dismiss, Ex. B.)  Peckville responded with a petition to strike off and/or open judgment by confession, which was substantially similar to the one filed regarding the Pottsville loan.  (Defs.' Mot. to Dismiss, Ex. E.)  Peckville argued that Parke Bank "misapplied loan proceeds and income in an improper manner" and applied funds received towards Peckville's loan to other loans and other individuals, "leaving Peckville liable for a greater amount than it should have been."  (<u>Id.</u> ¶¶ 1, 47–50.)  The petition further alleged that despite the fact that loan documents provided that Bruce Earle was the sole individual who could obtain financing or enter into loan agreements on behalf of Peckville, a business acquaintance of Spaeder named Joseph Sweeney executed the loan agreements.  (<u>Id.</u> ¶¶ 31–36.)  In addition, both Sweeney and his wife, neither of whom had any connection to Peckville or benefitted therefrom, personally guaranteed the $5.2 million dollar loan.  (<u>Id.</u> ¶¶ 37–40.)

The state court denied this petition on June 18, 2013.  (Defs.' Mot. to Dismiss, Ex. B.)

*b.*     *Federal Court Claims*

Like the state court petition, the federal RICO claims and state law claims of fraud, conversion, and civil conspiracy in the federal Amended Complaint are premised on the assertion that Peckville received a loan from Parke Bank in the amount of $5,200,000 in connection with its acquisition of an existing shopping center located on Main Street in Peckville, PA on May 1, 2008.  As it did with the other Partnerships, Parke Bank began wire transferring Peckville's funds to Rosedon Holding.  The federal suit alleges that none of the transfers were properly authorized by Peckville.  Additionally, over the course of approximately three months during 2011, the Amended Complaint alleges that Parke Bank authorized payment to Rosedon Holding on six unsigned or fraudulently executed checks drawn against the Peckville account, through which Rosedon Holding converted a total of $56,400 from Peckville.

Parke Bank also allegedly engaged in a unilateral modification of Peckville's loan terms. In September 2011, Pantilione and/or Gallo requested that Peckville voluntarily agree to direct its tenants to pay their monthly rent into a lockbox controlled by Parke Bank, and Spaeder agreed to the request.  Parke Bank purportedly failed to collect over $400,000 in rent and fees, and improperly assessed Peckville with "Late Charges" of $99,999.99 each.

3.     Rhoads Avenue Partnership

*a.*     *State Court Proceedings*

On July 29, 2013, Parke Bank confessed judgment in state court against Rhoads Avenue on its guaranty of the $8,000,000 Pottstown loan.  (Defs.' Mot. to Dismiss, Ex. C.)  On November 7, 2014, Rhoads Avenue filed a petition to strike or open the judgment.  (Id., Ex. F.) In that petition, Rhoads Avenue alleged generally that its agreement to execute the guaranty was void and unenforceable since it was obtained as a result of Parke Bank's fraudulent conduct in

the use of funds. (Id.) In support of its petition, Rhoads Avenue set forth the following

allegations:

- Parke Bank, through Pantilione, threatened that all of Spaeder's business with Parke Bank would be at risk if Spaeder did not execute the Rhoads Avenue documents to provide additional security for the Pottstown loan, a loan totally unrelated to any aspect of the Rhoads Avenue project. (Id. ¶¶ 11–12.)

- Pantilione promised Spaeder that he would never file the Assignment of Leases or Leasehold Mortgage or enforce the Guaranty since he was using them to placate federal regulators, but Pantilione did so anyway. (Id. ¶ 13.)

- Parke Bank collected $800,000 from the lien of its judgment against Pottstown from another guarantor of the loan, Rosedon Holding, but failed to apply the $800,000 to reduce the amount of the confessed judgment against Pottstown, and instead applied it to reduce the balance of an unrelated loan to Earle and Rosedon Holding. (Id. ¶¶ 18–29.)

- Parke Bank improperly used rent payments collected from Pottstown's tenants to pay down loans other than the Pottstown loan. (Id. ¶¶ 31–40.)

- Parke Bank was required to lend the construction loan funds to Pottstown as the borrower. Parke Bank, however, lent them to Rosedon Holding, the entity controlled by Earle. (Id. ¶¶ 41–49.)

- Parke Bank improperly paid tens of thousands of dollars from Pottstown's account based on checks with forged signatures, including in excess of $185,000 on unsigned checks which were not submitted for payment by Rhoads Avenue or Spaeder, but were nonetheless drawn on the Pottstown account at Parke Bank. (Id. ¶¶ 50–56.)

- Parke Bank violated the terms of the Pottstown Construction Loan Agreement by disbursing construction funds even though the Construction Loan Agreement required that such Construction Loan not be disbursed until certain requirements were met. (Id. ¶¶ 57–65.)

On February 9, 2015, the Delaware County Court of Common Pleas granted Parke Bank's motion to strike this petition as untimely. (Defs.' Mot. to Dismiss, Ex. C.)

Also with respect to Rhoads Avenue, the subtenant at the PNC Property, Eckerd Corporation, filed an interpleader action in this Court to resolve competing claims to rents owed by Eckerd (Rite Aid) under a sublease between it and Rhoads Avenue. (Eckerd Corp. v. Rhoads Avenue Newtown Square, LP, No. 13-4752 (E.D. Pa Aug. 15, 2013).) In response, Rhoads Avenue filed a cross-claim, again asserting that Parke Bank, through Pantilione, improperly and fraudulently insisted that Rhoads Avenue provide a leasehold mortgage and assignment of rents relating to the Pottstown property as additional collateral and execute a guaranty. (Id., ECF No. 7.) Parke Bank moved to dismiss the cross-claim on grounds that the confession of judgment was res judicata of all matters regarding the execution of the lease assignment and guarantee. (Mot. to Dismiss, Eckerd Corp., No. 13-4752, ECF No. 85 (E.D. Pa. Aug. 21, 2014).) I agreed and dismissed the cross-claim with prejudice. (Id., ECF No. 136; Defs.' Mot. to Dismiss, Ex. J.)

### b. Federal Court Claims

The federal RICO claims and state law claims of fraud, conversion, and civil conspiracy in the federal Amended Complaint similarly allege that, in October 2011, Pantilione advised Spaeder that Pottstown must immediately either present additional collateral for the Pottstown loan, or Parke Bank would have to charge it $5,000,000. Pantilione purportedly suggested the additional collateral should come from Rhoads Avenue, but promised he would not record, perfect any security instruments for, or use any such additional collateral. On October 25, 2011, Parke Bank's attorney circulated draft security instruments to Spaeder, on behalf of Rhoads Avenue, which included a leasehold mortgage, assignment of rents, and guaranty agreement. Relying on Pantilione's representations that Parke Bank would never use the security

agreements, Rhoads executed them and delivered them to Pantilione.  Contrary to his representations, however, Pantilione caused each of the Agreements to be recorded in Delaware County, and Parke Bank subsequently used them to secure a judgment by confession against Rhoads Avenue.

4.     Application of the Res Judicata Elements

As set forth above, a finding of res judicata requires (1) a final judgment on the merits in a prior action, (2) involving the same parties or their privies, and (3) the same claims.  E.E.O.C. v. U.S. Steel Corp., 921 F.2d 489, 493 (3d Cir. 1990).  In light of the underlying similarity between the state court confession actions against Pottstown, Peckville, and Rhoads Avenue, and the current federal court claims, I find that all of the elements of res judicata are present and that the federal claims are barred.

*a.     Final Judgment on the Merits*

The first factor requires that the prior proceedings—in this case, the state court confessed judgments—be final judgments on the merits.  A federal court must give a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which it was rendered.  Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 83 (1984).  "Under Pennsylvania law, a judgment by confession is a final judgment 'on the merits' which operates as res judicata to bar a collateral challenge to that judgment or any claim arising out of the same underlying transaction or nucleus of events."  Zhang v. Se. Fin. Grp., Inc., 980 F. Supp. 787, 792 (E.D. Pa. 1997).  Res judicata will apply "where the . . . claims could have been raised in confession of judgment proceedings through a petition to open or strike off the judgment entered upon confession but were, instead, raised in a new action."  Newton v. First Union Nat'l Bank, 316 F. Supp. 2d 225, 238 (E.D. Pa. 2004) (quotations omitted).

Plaintiffs argue that no "final judgment on the merits" exists because the state court "summarily denied" the petitions to reopen with no supporting opinions regarding the bases for the denials. As a result, they contend that I cannot discern, for res judicata purposes, what issues the state court actually determined.

This argument misunderstands the Pennsylvania confession process. After a confession of judgment is entered, a defendant may petition to open or strike the judgment. Pennsylvania Rule of Civil Procedure 2959 provides that all grounds for relief "whether to strike off the judgment or to open it must be asserted in a single petition" and "a party waives all defenses and objections which he did not include in his petition or answer." Pa. R. Civ. P. 2959(a)(2) and (c). "If the party against whom judgment is confessed pleads prima facie grounds for relief, the court must open the judgment, and 'may grant a stay of proceedings.'" Resolution Trust Corp. v. W.W. Dev. & Mgmt., Inc., 73 F. 3d 1298, 1308 (3d Cir. 1996) (citing Pa. R. Civ. P. 2959(b)). Testimony, depositions, admissions, or other evidence may be produced and, if that evidence creates issues that need to be resolved by a jury, the court shall open the judgment. Id. at R. 2959(e). Thus, a confessed judgment and, logically, a denial of a petition to reopen the confessed judgment "would necessarily imply a determination that [the defendant to the confessed judgment] was in default in the stated amount under a valid and enforceable note." Stoss v. Singer Fin. Corp., No. 08-5968, 2010 WL 678115, at *4 (E.D. Pa. Feb. 24, 2010) (quoting Zhang v. Haven–Scott Assoc., Inc., No. 95–2126, 1996 WL 355344 at *8 (E.D. Pa. June 21, 1996)).

In this case, Pottstown, Peckville, and Rhoads Avenue actually raised allegations that challenged the validity and enforceability of the loan on which the judgments were based. Had the state court found any of these allegations to be meritorious, it could have reopened the

judgment. The state court's refusal to do so, whether or not accompanied by a written opinion, constitutes a final and express denial of those grounds.[10]

Plaintiffs argue that the Rhoads Avenue petition was stricken as untimely and, therefore, the state court's decision does not constitute a final judgment on the merits. However, it is not the state court decision striking the petition which constitutes res judicata; rather it is the original confessed judgment that operates to preclude the federal claim. Collateral challenges to the loan at issue "could have been brought" in a petition to reopen. The fact that Rhoads did not do so in a timely manner does not deprive the state court's confessed judgment of the requisite finality. See Zhang v. Haven-Scott Assocs., Inc., No. 95-2126, 1996 WL 355344, at *7 (E.D. Pa. June 21, 1996) ("A party who fails to petition to open or strike a confessed judgment is barred by res judicata from raising in a collateral proceeding any issue she could have raised as a defense in such a petition.") (citing Romah v. Romah, 600 A.2d 978, 981 (Pa. Super. 1991) (finding that failure to timely petition the trial court to open or strike off the judgment waives the right to raise the issues and the party cannot raise the issues in a collateral proceeding)).

### b. Same Parties

Second, the prior suit involved the same parties—Pottstown, Peckville, or Rhoads Avenue, on one hand, and Parke Bank, on the other hand. Although Plaintiffs argue that their claims against individual defendants Vito Pantilione and Ralph Gallo cannot be barred because these Defendants were not individually named in the state court action, "[t]he doctrine of res

---

[10]    Plaintiffs cite Kauffman v. Moss, 420 F.2d 1270 (3d Cir. 1970) for the proposition that "[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." Id. at 1274. That case involved the distinguishable question of when litigation of a question in a civil suit is barred by a prior criminal trial, noting that the standard is "whether the question was distinctly put in issue and directly determined in the criminal prosecution, and issues which were essential to verdict of guilty must be regarded as having been determined by the judgment." Id.

judicata applies to parties where one is vicariously responsible for the other, such as in an employer-employee relationship." Metcalf v. Merrill Lynch, Pierce, Fenner & Smith, 895 F. Supp. 2d 645, 657 (M.D. Pa. 2012) (citing Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 548 n.11 (3d Cir. 2006); Restatement (Second) of Judgments § 51 (1982)), reversed on other grounds 587 F. App'x 719 (3d Cir. 2014). The Amended Complaint contains no allegations that Pantilione and Gallo were acting outside the scope of their employment. To the contrary, the Amended Complaint repeatedly emphasizes that their actions were taken entirely on behalf of Parke Bank. As such, I find Pantilione and Gallo to be in privity with Parke Bank for purposes of res judicata.

c.     *Same Claims*

The last element requires that the prior suits involve the same claims. Making this determination "does not depend on the specific legal theory invoked, but rather 'the essential similarity of the underlying events giving rise to the various legal claims.'" Elkadrawy v. Vanguard Grp., Inc., 584 F.3d 169, 173 (3d Cir. 2009) (quoting Davis v. U.S. Steel Supply, 688 F.2d 166, 171 (3d Cir. 1982)) (internal quotations omitted). In analyzing essential similarity, I am guided by several factors: (1) whether the acts complained of and the demand for relief are the same; (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same; and (4) whether the material facts alleged are the same. Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 277 (3d Cir. 2014) (quotations omitted), cert. denied, 135 S. Ct. 1738 (2015). "It is not dispositive that a plaintiff asserts a different theory of recovery or seeks different relief in the two actions." Id. Moreover, res judicata will "not be defeated by minor differences of form, parties or allegations" where the "controlling issues have been resolved in a prior proceeding in which the present parties had an opportunity to

appear and assert their rights." Zhang, 1996 WL 355344, at *8 (quoting Helmig v. Rockwell Mfg. Co., 131 A.2d 622, 627 (Pa. 1957)).

Here, the federal and state law claims raised in the Amended Complaint by Pottstown, Peckville, and Rhoads Avenue Partnerships are premised on allegations that, beginning in 2008, Parke Bank fraudulently induced the signing of guaranties, misapplied loan proceeds, cashed bad checks against the Partnerships' account, and improperly authorized the transfer of construction funds from the various loans to Earle/Rosedon Holding. These allegations were also at issue in the state court proceedings. Although these issues were presented as defenses to the confessed judgments, and while the federal action raises these issues in the form of a request for affirmative relief under RICO, the material factual events and corresponding evidentiary proof underlying the two proceedings are practically identical. See Davis v. U.S. Steel Supply, Div. of U.S. Steel Corp., 688 F.2d 166, 171 (3d Cir. 1982) ("Rather than resting on the specific legal theory invoked, res judicata generally is thought to turn on the essential similarity of the underlying events giving rise to the various legal claims, although a clear definition of that requisite similarity has proven elusive.").

In an effort to refute this conclusion, Plaintiffs posit two arguments. First, they contend that res judicata does not apply because Pottstown, Peckville, and Rhoads Avenue could not raise the claims asserted in the Amended Complaint as grounds to open Parke Bank's confession of judgment. Second, they contend that some of the predicate acts forming the basis of their RICO action were not raised in the petition to open the confession judgment.

The flaw within Plaintiffs' first argument is illustrated by Plaintiffs' misplaced reliance on the case of Zhang v. Se. Fin. Grp., Inc., No. 95-2126, 1996 WL 355344 (E.D. Pa. June 21, 1996). In Zhang, a confessed judgment was entered against the plaintiff on a debt owed to the

defendants.  Id. at *3.  The plaintiff brought a complaint in federal court alleging, in part, (a) a RICO claim premised on a scheme to fraudulently induce persons to purchase services and sign notes and (b) a Fair Debt Collection Practices Act ("FDCPA") claim that defendant used unlawful means to collect the debt after she failed to pay the amount due.  Id. at *1.  In a Rule 12(b)(6) motion to dismiss, the defendants raised a res judicata defense regarding only the FDCPA claim, alleging that the plaintiff never brought that claim in the confession action as a counterclaim.  Id. at *7.  Although the court acknowledged that a judgment by confession is a final judgment on the merits that can act as a res judicata bar on a collateral challenge to that judgment, the court held that res judicata was not applicable because there was no identity of issues between the confession action and the FDCPA claim.  Id. at *8.  The court reasoned that, in the confession action, the plaintiff could only have raised claims that would nullify or call into question the validity of the debt on which the confessed judgment is entered.  Id.  By contrast, the FDCPA claim attacked the methods by which the defendants attempted to collect the debt. Id.

During the subsequent summary judgment proceedings, however, the defendants raised a new res judicata defense, this time alleging that the plaintiff's RICO and fraudulent inducement claims were barred by the confession of judgment in the state courts.  Zhang v. Se. Fin. Grp., Inc., 980 F. Supp. 787, 792 (E.D. Pa. 1997).  The court found that both the fraud in the inducement and the RICO claim challenged the validity of the debt and were grounds to open the confessed judgment.  Id. at 795.  As such, plaintiff was barred by res judicata from re-asserting those claims in federal court.  Id. (citing Klecha v. Bear, 712 F. Supp. 44, 47 (M.D. Pa. 1999) (res judicata effect of confessed judgment bars claim based on fraud in the inducement); Kravinsky v. Wolk, No. 86-4820, 1988 WL 84748, at *1 (E.D. Pa. Aug. 11, 1988) (res judicata

effect of denial of petition to open confessed judgment bars RICO claim based on fraud), aff'd, 869 F.2d 589 (3d Cir. 1989)) (further citations omitted).[11]

Here, Parke Bank confessed judgment against Pottstown, Peckville, and Rhoads Avenue for defaulting on their loans. In their petitions to reopen, these partnerships specifically asserted that Parke Bank mishandled and misappropriated funds, violated loan agreements, and disbursed funds on fraudulent checks. These allegations directly challenged the validity of the confessed judgment. They were not, as Plaintiffs urge, collateral actions for unliquidated amounts unrelated to the validity of the confessed judgment. The mere fact that Plaintiffs now couch these assertions in the form of RICO claims does not undermine the prior state court determinations. See Riverside, 581 F.2d at 67 ("[T]he common pleas court adjudicated the validity of the judgment note and its consideration in favor of [the broker]. [Plaintiffs] cannot evade that finding by simply adding allegations of conspiracy to the very same activity passed upon the state court.").

Plaintiffs' second argument fares no better. They contend that Pottstown and Peckville did not put before the state court several of the predicate acts underlying their RICO claims and,

---

[11]    Plaintiffs' other citations are also inapposite. In Riverside Memorial Mausoleum, Inc. v. UMET Trust, 581 F.2d 62 (3d Cir. 1978), the Third Circuit simply found that "Pennsylvania practice does not permit the filing of a counterclaim for an unliquidated amount in a petition to open a judgment if the counterclaim is not directly related to the cause of action on which the plaintiff's judgment has been entered." Id. at 68. That case did not address the situation where a claim has or could have been raised as a ground to open the confessed judgment. Similarly, in Hopewell Estates, Inc. v. Kent, 646 A.2d 1192 (Pa. Super. Ct. 1994), the court acknowledged that claims that are grounds to open a confessed judgment may subsequently be barred by res judicata. Id. at 1194. It found, however, that the appellant's claim for professional malpractice could not have been litigated as a part of the proceedings to open the judgment confessed against appellant for professional fees owed pursuant to contract. Id. at 1195.

as such, not all of their claims were decided.[12]  Res judicata, however, "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."  Brown v. Felsen, 442 U.S. 127, 131 (1979); see also CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 194 (3d Cir. 1999).  Merely alleging several new and discrete events in support of a claim in a subsequent adjudication does not extinguish the res judicata effect since "[a] claim extinguished by res judicata includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, *or series of connected transactions,* out of which the action arose."  Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 277 (3d Cir. 2014) (emphasis in original) (internal quotation marks omitted).

As noted several times above, in the state court, Plaintiffs challenged the validity of the confessed judgments based on Parke Bank's mishandling of loan proceeds and violation of loan agreements.  In federal court, Plaintiffs now allege that these same actions constitute a pattern of racketeering in violation of RICO.  But the fact that some of the predicate acts set forth in support of the RICO claim were not specifically alleged in state court—although they could have been—does not deprive the state court judgment of preclusive effect.

5.  Whether the Doctrines of Adverse Domination and Fraudulent Concealment Preclude Application of Res Judicata

In a final effort to avoid the application of res judicata to Pottstown, Peckville, and Rhoads Avenue, Plaintiffs contend that, even assuming all of the elements of res judicata are met, the defense fails under the doctrines of adverse domination and fraudulent concealment.

---

[12]  Specifically, Plaintiffs argue that Pottstown did not allege in state court that Parke Bank gave a lockbox directive to Pottstown's tenants, causing Bottom Dollar to cancel its lease.  Moreover, Peckville did not argue in state court that Parke Bank unilaterally imposed and collected more onerous monthly loan payments, along with loan extension and late fees from Peckville.

Plaintiffs reason that when Parke Bank entered the confessions of judgment, all of the Partnerships were under the exclusive control of Parke Bank's co-conspirator Earle, who was actively trying to conceal the activities of the racketeering enterprise.[13]  As such, it was Earle who (a) responded to Parke Bank's confessions of judgment against Pottstown and Peckville on January 25, 2013, and (b) failed to file a timely petition to reopen the confession of judgment against Rhoads Avenue.  Plaintiffs now contend that Earle's adverse domination and fraudulent concealment preclude a res judicata bar.

These doctrines do not apply to the case before me.  "Under the doctrine of adverse domination, the statute of limitations is tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers."  Resolution Trust Corp. v. Farmer, 865 F. Supp. 1143, 1151 (E.D. Pa. 1994) (citing 3A Fletcher Cyclopedia § 1306.20)).  "The doctrine is based on the theory that the corporation which can only act through the controlling wrongdoers cannot reasonably be expected to pursue a claim which it has against them until they are no longer in control."[14]  Id. The doctrine of fraudulent concealment serves to toll the statute of limitations where the wrongdoer has taken some step to deceive, either intentionally or unintentionally, so that the plaintiff is not aware of the injury until after the statute of limitations has lapsed.  Id. Importantly, in both cases, the doctrines serve as a basis for equitable tolling to excuse untimely filings.

---

[13]    By order dated August 16, 2012, the state court prohibited Spaeder from having any involvement in the Partnerships and granted Earle, doing business as Rosedon Holding, exclusive control.  (Pls.' Resp. Opp'n, ECF No. 20, Ex. 11.)

[14]    Although Pennsylvania courts have not explicitly adopted this theory, federal courts have found that the adverse domination theory is applicable to equitably toll the statute of limitations for a cause of action based upon Pennsylvania state law claims. In re O.E.M./Erie, Inc., 405 B.R. 779, 785–86 (W.D. Pa. 2009).

In the present case, Plaintiffs face no statute of limitations issues with respect to either Pottstown or Peckville. To the contrary, Plaintiffs actually filed petitions to open the confessed judgments against Pottstown and Peckville in state court and specifically and timely set forth claims of fraudulent activity by Parke Bank. Plaintiffs do not cite, and I cannot locate, any cases where adverse domination and fraudulent concealment were applied outside the tolling context to preclude a finding of res judicata.[15]

To the extent that Plaintiffs contend that the doctrines of adverse domination and fraudulent concealment should excuse Earle's failure to file a timely petition to reopen the confession of judgment against Rhoads Avenue, I have already considered and rejected this argument. As noted above, one of Rhoads Avenue's tenants, Eckerd, filed an interpleader action on August 15, 2013 to determine who should receive its rent payments. Rhoads Avenue filed a cross-claim against Parke Bank alleging, in part, that Parke fraudulently induced Rhoads Avenue into signing the Parke loan documents. Parke Bank moved to dismiss, contending that the confessed judgment operated as a bar to Rhoads Avenue's cross-claim. In its response—filed at the time when Plaintiffs had control over the partnerships and had already settled with Earle— Rhoads Avenue did not argue that its untimely petition resulted from the fact that Earle was in

---

[15] Plaintiffs rely on the case of <u>FDIC v. Bird</u>, 516 F. Supp. 647 (D.P.R. 1981), which held that "a cause of action does not accrue while the culpable directors remain in control of the bank." <u>Id.</u> at 651. In so ruling, the court exhibited "an implicit appreciation of the realities of the shareholders' position, that, without knowledge of wrongful activities committed by directors, shareholders have no meaningful opportunity to bring suit." <u>Id.</u> Plaintiffs urge that this same reasoning should apply in this case where the partnerships did not have a meaningful opportunity to assert the relevant claims against Parke Bank while Earle was in control.

Putting aside the factual dispute of whether Earle was actually in control of the Partnerships at the time of the confessed judgments, Plaintiffs' argument still misses one crucial point. The Partnerships knew of the alleged wrongdoing and actually filed petitions to reopen the confessed judgment on the basis of fraud and breach of fiduciary duty. Unlike the situation in <u>Bird</u>, Plaintiffs here raised the relevant claims now barred by res judicata.

control of Rhoads Avenue.  Rather, it contended that it was precluded from filing its petition because of (a) defective service and (b) an alleged inability to raise invalidity issues in the confession action.  In an opinion issued on August 4, 2015, I rejected both of those arguments and found that Rhoads Avenue's failure to file a petition to reopen the judgment barred it from asserting that the guaranty, assignment and mortgage were procured by fraud or were not properly recorded in the action.  (Defs.' Mot. to Dismiss, Ex. J.)

Having lost on their previous efforts to explain away their untimely petition, Plaintiffs may not now get a second bite at the apple and offer the alternate argument that their failure to timely file a petition to reopen the confessed judgment was a result of Earle's control of Rhoads Avenue.

### 5.      Conclusion as to Pottstown, Peckville, and Rhoads Avenue

In light of the foregoing, I find that all of the claims by Plaintiffs Pottstown, Peckville, and Rhoads Avenue in the Amended Complaint were raised and rejected, or could have been raised, in their petitions to reopen the confessions of judgment in state court.  Accordingly, I conclude that the doctrine of res judicata applies and I will dismiss their claims with prejudice.

### B.      **Shea's Claim**

### 1.      State Court Proceedings

On August 1, 2013, Parke Bank filed a Complaint in Delaware County Court of Common Pleas against Shea because he defaulted under the Shea LOC.  (Defs.' Mot. to Dismiss, Ex. G.) In his Third Amended Answer and New Matter, Shea made the following claims:

> - On October 23, 2008, Shea was told by a business associate, Earle, that Earle and his entities wanted to borrow money from Parke Bank, but due to federal lending limits, Parke Bank could not lend the money.  (Def.'s Mot. to Dismiss, Ex. I, ¶¶ 16–17.)

- Earle asked Shea to sign the loan papers, but stated that Shea would have no liability because the loan would be fully collateralized by Earle's property. (<u>Id.</u> ¶ 18.)

- Shea agreed and, on October 23, 2008, Earle picked up Shea and drove him to Parke Bank. Shea spent about one-half hour there and the only person who saw him or spoke to him was a person named "Dee." (<u>Id.</u> ¶¶ 20–21.)

- Shea did not read any of the documents and was never asked by anyone at the Bank why he was signing the loan documents, or what he believed the loan was for. (<u>Id.</u> ¶¶ 22, 24.) Nor was he asked by the Bank to provide any financial statements, tax returns, or other proof of worth. (<u>Id.</u> ¶ 25.)

- After he signed the documents, Shea got back in Earle's car and was driven home. (<u>Id.</u> ¶ 26.)

- Shea never received any of the loan proceeds. (<u>Id.</u> ¶ 27.)

On January 20, 2015, the state court entered a default judgment in favor of Parke Bank and scheduled a damages hearing. (Def.'s Mot. to Dismiss, Ex. G.) At the damages hearing, the court entered judgment against Shea in the amount of $1,573,682.25. (<u>Id.</u>, Ex. H.)

### 2. Federal Court Claims

The federal and state law claims in the current Amended Complaint allege that in mid-2008, Earle went to Pantilione about obtaining a line of credit to provide additional funds for his ventures. Pantilione identified a property owned by Earle and his wife in Margate, NJ as a source of security for the line of credit, but explained that Earle could not personally guaranty the line of credit due to lending limit regulations. As such, Pantilione suggested the Earle find a business associate to personally guarantee the line of credit. Earle approached Shea about his willingness to guarantee the line of credit. Pantilione then represented to Shea that Parke Bank viewed the real security for the line of credit to be the mortgage on Margate Property and that $2,350,000 of the funds available through the line of credit would be used as additional cash

collateral to help improve the collateralization of the Lionville, Pottstown, and Peckville loans. In reliance on these representations, Shea agreed to enter into the line of credit agreement and guarantee the funds.

### 3. Application of Res Judicata Elements

Given the foregoing, I find that Shea's claims, like those of Pottstown, Peckville, and Rhoads Avenue, are barred by res judicata.

First, the state court action constituted a final judgment on the merits. The Third Circuit has repeatedly emphasized the longstanding principle law that "a default judgment is a final judgment with res judicata effect." Schuldiner v. Kmart Corp., 284 F. App'x 918, 921 (3d Cir. 2008) (citing Riehle v. Margolies, 279 U.S. 218, 225 (1929)). Pennsylvania courts have also expressly found that "[a] default judgment in an earlier case constitutes a "valid final judgment on the merits" for the purpose of a res judicata analysis. See Zimmer v. Zimmer, 326 A.2d 318, 320 (Pa. 1974) ("This Court has long held that a judgment by default is res judicata and quite as conclusive as one rendered on a verdict after litigation insofar as a defaulting defendant is conceived.").[16]

Second, the parties are the same in the two litigations. In state court, Parke Bank brought suit against Shea. In federal court, Shea has brought suit against Parke Bank and its privies.

Finally, the state court suit involved the same claims as the present federal action. In state court, Shea filed an Answer, New Matter, and Counterclaims alleging fraud in the

---

[16]     See also Morris v. Jones, 329 U.S. 545, 550–51 (1947) ("A judgment of a court having jurisdiction of the parties and of the subject matter operates as res judicata, in the absence of fraud or collusion, even if obtained upon a default.") (internal quotation marks omitted); Balent v. City of Wilkes–Barre, 669 A.2d 309, 313 (Pa. 1995) ("Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. Res judicata applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action.").

inducement, fraud, civil conspiracy, and breach of contract/lender liability. In response to Parke Bank's preliminary objections and/or motions for summary judgment, Shea amended his pleading three times, ultimately filing a Third Amended Complaint that converted his counterclaims into the affirmative defenses of fraud, fraud in the inducement, illegality, unclean hands, bad faith, unfair lending practices, and breach of contract. These defenses mirror the federal court claims. See Smith v. Litton Loan Servicing, LP, No. 04-2846, 2005 WL 289927, at *5 (E.D. Pa. Feb. 4, 2005) (holding that where current federal claims would have been defenses to foreclosure, the entry of a default foreclosure judgment by the state court constitutes a bar to the reassertion of any such claims in federal court that should have been litigated in the state court). The simple fact that Shea now couches his claims in the RICO statute does not disrupt the essential similarity of the underlying events giving rise to the claims.

In light of the foregoing, Shea's claims are barred by the doctrine of res judicata.

**C.    Lionville's Claims**

1.    State Court Proceedings

On April 1, 2013, Plaintiff Spaeder filed a complaint in Delaware County against Earle, Earle's wife, and Earle's company Rosedon Holdings. (Defs.' Mot. to Dismiss, Ex. K.) Spaeder made the following allegations with respect to Lionville:

- Spaeder negotiated the December 17, 2007 purchase of a movie theater in Lionville, Chester County, on behalf of Earle and Spaeder's partnership, for $2,456,644 with proceeds from a second loan for $3,098,000 from Parke Bank. The funds in excess of the purchase price were kept in escrow by the Bank for construction. Earle guaranteed the loan and legal title was put in Devon Drive Lionville, LP, with equitable ownership in the partnership between Earle and Spaeder. (Def.'s Mot. to Dismiss, Ex. 27, ¶ 40.)

- In December 2010, Spaeder negotiated refinancing the loan and, due to loan lending limits to Earle at Parke Bank, Spaeder

and Earle asked third party Jerry Naples to guaranty the new $6,700,000 note. Proceeds from this new loan were used to (a) pay off the original loan of $3,098,000 that was guaranteed by Earle; (b) pay the contractor $2,500,000 for construction at the Rite Aid building at Lionville; and (c) held in escrow $1,102,000 for Phase 2 of the Devon Drive Lionville development. (Id. ¶ 57.)

- In exchange for his guaranty, Naples was given a controlling interest in the Lionville property. On December 29, 2010, Earle sold 100% of his interest in the Lionville Partnership to Naples, and Earle and Spaeder resigned as officers and managers. (Id. ¶ 58.)

- Earle misappropriated $930,383 from Lionville between February 9, 2010 and June 4, 2012. The source of the money that he misappropriated was the Parke Bank loan guaranteed by Naples. Most of the misappropriated funds were simply transferred to Rosedon Holding to be used for the Earles' personal benefit. (Id. ¶ 84.)

- Spaeder's relationship with Earle collapsed in March, 2012, when Earle instructed Spaeder to physically go to Parke Bank and move all funds out of Devon Drive Lionville, LP, and Peckville, and deposit them in the Rosedon Holding account. (Id. ¶ 97.)

Spaeder eventually settled that suit with Earle and gave Earle and Rosedon Holding an unlimited general release of all claims against them and their "representatives, agents, attorneys, employees, affiliates, predecessors, officers, directors, shareholders, members, partners, successors, heirs, executors, and assigns," from all causes of action "from the beginning of time." (Defs.' Mot. to Dismiss, Ex. L.) On October 10, 2013, the state court entered the Praecipe to Settle, Discontinue and End the case. (Id., Ex. M.)

       2.   Federal Court Claims

According to the federal Amended Complaint, Parke Bank transferred funds by wire from Lionville to other Parke Bank accounts and, predominantly, to an outside bank account for Rosedon Holding, all without Lionville's consent or approval. Unaware of these transactions,

Lionville, through Spaeder, sought to refinance the Parke Bank loan to obtain needed construction funds. Pantilione agreed to refinance the Lionville loan on the condition that Earle reduce his ownership interests in Lionville so that Parke Bank would not run afoul of lending limitations. In December 2010, Lionville closed on a new loan with Parke Bank for $6,700,000, with a guaranty from a minority partner, Jerry Naples. At Pantilione's direction, however, Parke Bank refused to release any funds for construction unless Earle was completely removed from Lionville's ownership.

In September 2011, Gallo approved payment on an allegedly fraudulent A1A form and directed payment from Lionville's construction loan account to Rosedon Holding, despite knowing that the money did not correspond to any construction cost incurred. Upon receipt of the money from the Lionville construction loan account, Rosedon Holding transferred the majority of the funds from its account back to Parke Bank as payment on several past-due mortgage loan obligations, including the loan for Lionville.

3. Application of Res Judicata Elements

Unlike the previous Plaintiffs, I find that Lionville is not barred by res judicata because neither Lionville nor Parke Bank was a party to the prior settlement. Given the absence of facts to establish the second element of res judicata, this defense does not preclude Lionville's claims.[17]

---

[17] As to the first element, the Third Circuit has held that a settlement agreement could constitute a final judgment on the merits. Weber v. Henderson, 33 F. App'x 610, 612 (3d Cir. 2002) ("For purposes of *res judicata*, final judgment on the merits occurred when the District Court approved settlement and dismissed the case."); see also Rein v. Providian Fin. Corp., 270 F.3d 895, 903 (9th Cir. 2001) ("A judicially approved settlement agreement is considered a final judgment on the merits." (citations omitted)); Guiles v. Metro. Life Ins. Co., No. 00–5029, 2001 WL 1454041, at *1 (E.D. Pa. Nov. 13, 2001) ("A judgment entered with prejudice pursuant to a settlement is a final judgment on the merits for the purposes *of res judicata*."). Accordingly, the

In an attempt to overcome this deficiency, Defendants rely on a two-tiered privity argument. First, they contend that the relationship between Spaeder and Lionville is such that Lionville should be deemed to be in privity with Spaeder. Second, they assert that Earle is alleged to have conspired with Parke Bank and, therefore, is in privity with Parke Bank.

As set forth above, "[p]rivity exists where a party adequately represented the nonparties' interests in the prior proceeding." <u>Berwind Corp. v. Apfel</u>, 94 F. Supp. 2d 597, 609 (E.D. Pa. 2000) (citing <u>Martin v. Wilks</u>, 490 U.S. 755, 761 n.2 (1989) (a nonparty may be bound if his interests are "adequately represented by someone with the same interest who is a party"); <u>Gambocz v. Yelencsics</u>, 468 F.2d 837, 841 (3d Cir. 1972) (res judicata bars second action as to defendants who were not parties to first action when there is close or significant relationship between them and defendants who were parties)). "[P]rivity requires a prior legal or representative relationship between a party to the prior action and the nonparty against whom estoppel is asserted. Without such a relationship, there can be no estoppel." <u>Nationwide Mut. Fire Ins. Co. v. George V. Hamilton</u>, Inc., 571 F.3d 299, 312 (3d Cir. 2009). The United States Supreme Court has identified six categories where nonparty preclusion may be appropriate:

> 1) the nonparty agrees to be bound by the determination of issues in an action between others;
>
> 2) a substantive legal relationship—i.e. traditional privity—exists that binds the nonparty;
>
> 3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party";
>
> 4) the nonparty assumes control over the litigation in which the judgment is rendered;

---

Earle-Spaeder settlement, on which basis the state court dismissed the action with prejudice, constitutes a final judgment on the merits for purposes of res judicata.

> 5) the nonparty attempts to bring suit as the designated representative/agent of or proxy for someone who was a party in the prior litigation; and,
>
> 6) the nonparty falls under a special statutory scheme that "expressly foreclos[es] successive litigation by nonlitigants."

Taylor v. Sturgell, 553 U.S. 880, 893–94 (2008) (internal citations omitted).

None of these categories apply either to the Spaeder-Lionville relationship, or to the Earle-Parke Bank relationship.

As to the Spaeder-Lionville relationship, the first, fourth, fifth, and sixth categories are plainly irrelevant because nothing in the record indicates that Lionville agreed to be bound by the results of the Earle-Spaeder litigation, that Lionville assumed control over the state court litigation, that Lionville is now attempting to bring suit as Spaeder's designated representative, or that some special statutory scheme applies. The second category is similarly inapplicable because, although Spaeder was a partner in Lionville, Plaintiffs have identified no provision in the partnership agreement to indicate that Spaeder's individual action against another partner would bind the partnership. Finally, under the third category,[18] Lionville was not adequately represented by someone with the same interests. Rather, Spaeder raised claims against Earle to recover damages in his personal capacity and not on behalf of, or as the managing partner of, Lionville. On this record, and under these circumstances, there is no basis on which Spaeder could be viewed as so closely connected with Lionville that a suit by Spaeder against Earle could be tantamount to a suit by Lionville itself against Earle.

---

[18] Under the third category, "the interests of the party and nonparty must be squarely aligned and there must be either an understanding that the party is acting in a representative capacity or special procedural protections must have been in place in the original action to ensure the due process rights of nonparties who might face issue or claim preclusion." Nationwide Mut. Fire Ins. Co., 571 F.3d at 313.

As to the Earle-Parke Bank relationship, I also cannot find, on the record before me, that Parke Bank was in privity with Earle for purposes of res judicata. Relying on the Third Circuit case of <u>Gambocz v. Yelencsics</u>, 468 F.2d 827, 841 (3d Cir. 1972), Defendants assert that the Amended Complaint characterizes them as co–conspirators with Earle in the RICO violations and, therefore, they must be deemed to be privies of Earle for purposes of the prior settlement. Contrary to Defendants' theory, however, the <u>Gambocz</u> case does not automatically convert all co-conspirators into privies. In that matter, the original action averred a conspiracy participated in by multiple individuals, only some of whom were named as defendants. <u>Id.</u> at 842. The later suit set forth the same cause of action with the same conspiracy, but added some of the originally named conspirators as defendants. <u>Id.</u> The Third Circuit concluded that "the relationship of the additional parties to the second complaint was so close to the parties to the first that the second complaint was merely a repetition of the first cause of action and, therefore, it is barred by application of [res judicata]." <u>Id.</u>[19]

By contrast, the Spaeder-Earle lawsuit involved claims by Spaeder in his individual capacity against Earle in his individual capacity. The complaint in that matter involved no claims of a conspiracy between Earle and any other individual or entity. Nor did the complaint set forth any facts which could have indicated that Parke Bank was involved in any of the alleged wrongdoing. Perhaps most importantly, the Settlement Agreement to which Defendants seek to give res judicata effect is limited to the Earle entities and the Spaeder entities, of which Parke Bank is not a party, and expressly provides that "nothing herein, express or implied, is intended

---

[19] <u>See also</u> <u>Vacanti v. Apothaker & Assocs., P.C.</u>, No. 09-5827, 2010 WL 4702382, at *5 (E.D. Pa. Nov. 12, 2010) (applying res judicata where both former complaint and current complaint alleged the same violations of the FDCPA arising from the same facts, but the first suit alleged that the debt collection agency was responsible, while the second suit alleged that the attorney for the agency, acting on behalf of the agency, was responsible).

to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this agreement." (Defs.' Mot. to Dismiss, Ex. 28, ¶ 24.) The mere fact that Plaintiff now alleges that Earle and Parke Bank were co-conspirators in the purported wrongdoing does not permit Parke Bank to benefit from an otherwise private settlement between Spaeder and Earle.

As privity of parties is lacking between the Earle-Spaeder settlement and Lionville's claims against Defendants in this case, I need not address the last res judicata element. I conclude that res judicata does not apply to bar Lionville's current claims.

### D. Spaeder's Claims

Finally, Defendants seek a finding of res judicata with respect to claims brought by Spaeder individually. Defendants premise their res judicata argument on two theories: (1) the settlement of the Spaeder-Earle lawsuit operates as a res judicata for any claims against the current Defendants and (2) Spaeder's claims are derivative of the direct claims asserted by the Partnerships.

I find no merit to either theory. As discussed in detail above, the settlement in the Spaeder-Earle lawsuit cannot establish res judicata because although Spaeder was a party to that settlement, Earle was not in privity with Parke Bank or its officers. Moreover, nothing in the Amended Complaint reveals that Spaeder's individual claims are derivative of the Partnerships' claims. Rather, Spaeder signed a personal guaranty for the Pottstown loan for which he is now individually liable. Therefore, I will deny the Motion to Dismiss Spaeder's claims.

### E. Conclusion on Res Judicata

In light of the foregoing, I find that the claims of Plaintiffs Pottstown, Peckville, Rhodes Avenue, and Shea are all attempts to re-litigate matters that were fully and finally decided in

prior judicial proceedings before the state court. Under well-established res judicata principles, these claims will be dismissed with prejudice. The claims of Plaintiffs Lionville and Spaeder, however, are not barred by the doctrine of res judicata because there is an absence of privity between the parties in the state court action and the parties in the federal court action. To that end, I will deny the Motion to Dismiss Lionville's and Spaeder's claims on res judicata grounds.

## III. Whether Plaintiffs Have Properly Pled Their Causes of Action

Defendants argue, in the alternative, that (1) Plaintiffs lack standing to assert RICO claims; (2) Plaintiffs' fail to state a Section 1962(b) claim; (3) Plaintiffs fail to state claims for common law fraud; (4) Spaeder and Rhoads Avenue's claims are time barred; (5) Plaintiffs' conversion claims are barred by the gist of the action doctrine; and (6) Plaintiffs' common law conspiracy claim fails. Plaintiffs respond that they have standing, that their Amended Complaint states a violation of § 1962(b), and that their state law claims satisfy scrutiny.

I decline to consider any of these arguments at this juncture. The Amended Complaint sets forth the various causes of action as to all Plaintiffs collectively. As such, it is almost impossible to decipher which specific allegations go to which Plaintiff. Having now dismissed four of the six Plaintiffs, I cannot discern how the absence of these Plaintiffs' claims impacts the validity of the remaining causes of action by the remaining Plaintiffs. Accordingly, I will deny this portion of Defendants' Motion without prejudice.

## CONCLUSION

For all of the foregoing reasons, I will grant the Motion to Dismiss the Amended Complaint as to Plaintiffs Pottstown, Peckville, Rhodes Avenue, and Shea. Defendants' Motion regarding Plaintiffs Lionville and Spaeder is denied without prejudice. Plaintiffs Lionville and Spaeder shall either (1) file a Second Amended Complaint containing allegations only relating to

themselves and Defendants, or (2) state that they will not pursue any further claims against Defendants.  Upon the filing of a Second Amended Complaint, Defendants shall have another opportunity to move for dismissal.

An appropriate Order follows.